**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**STOW MANUFACTURING COMPANY, Respondent.**

No. 74, Docket 23104.

United States Court of Appeals Second Circuit.

Argued Oct. 6, 1954.

Decided Dec. 7, 1954.

Fannie M. Boyls, Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Jean Engstrom, Attorneys, National Labor Relations Board, for petitioner.

George C. Coughlin, Harrison, Coughlin, Dermody & Ingalls, Binghamton, N. Y., for respondent.

Before CLARK, Chief Judge, and L. HAND and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

This case comes up on a petition of the Labor Board to enforce its order entered upon a complaint against the respondent, a corporation engaged in interstate commerce in the manufacture of machine tools, machine tool accessories, and the like. The complaint was filed upon a charge by the International Association of Machinists—which we shall call the Union—and was referred to a trial examiner who held extensive hearings. The Board accepted the examiner's findings of fact in his intermediate report, and entered an order finding the respondent guilty of violations of §§ 8 (a) (2) and 8(a) (5) of the Labor-Management Act, 29 U.S.C.A. § 141 et seq. The examiner had recommended that the order should also include a violation of § 8(a) (1) of the Act; but the Board held that there was no evidence of this except insofar as such a violation was necessarily included in violations of §§ 8(a) (2) and 8(a) (5); and we shall therefore confine our consideration to those two subdivisions. The particular conduct enjoined upon the respondent was to bargain collectively with the Union as its exclusive representative and to withhold all recognition from what the Board held to have been a competing labor union under the name of "The Monthly Meeting of All De-partments." Incidentally, the order also forbade the respondent from interrogating its employees regarding their union activities and from engaging in certain other activities that we shall consider after our discussion of the two main questions.

The facts that are either established beyond dispute, or were found upon substantial evidence were as follows. Twice before September 1951 the Union had tried to organize the respondent's factory, both times unsuccessfully. In that month it began to do so again, and by September 20th, 41 of the 70 employees had signed cards as follows: "I, the undersigned, employee of Stow Mfg. Co. * * * hereby authorize the International Association of Machinists or any District or Local Lodge thereof to represent me for purposes of Collective Bargaining and, in my behalf, to negotiate and conclude all agreements as to hours of labor, wages or other conditions of employment." In spite of this unequivocal language the respondent argues that at least five of the cards should not be counted because the signers supposed that they were only asking that an election should be called at which they would vote for or against the Union as they then pleased. Since a reduction of these five votes would still leave a bare majority, we further understand the argument to be that the testimony of the signers puts in doubt at least one of the other putative votes and that that is enough. Assuming as much, we can find only three employees—Cacyuk, Charles Brown and Todd—who said that they understood the cards not to be votes for the Union. It is true that the testimony of several of the others can be so read, but it is not clear that it should be; and we cannot say, in the face of the express language of the cards themselves, that the examiner's finding that a majority meant to make the Union their representative was not supported by substantial evidence.

After securing these cards the Union on September 20 wrote a letter to the respondent, asking to be recognized as

the bargaining agent of the employees. The respondent had already got wind of the Union's efforts; and on the 18th had called a meeting of employees to "tell them our side of the story, give our opinion on the unions, etc."; and at this meeting the president had presented arguments against unions in general. He called a second meeting on September 25th, telling that he had received the letter; and on the same day the respondent's lawyers answered it, declaring that the respondent would ask the Board to conduct an election. On the 26th, both the Union and the respondent filed petitions for that purpose, and on October 11th, they entered into a written agreement for an election "by secret ballot to be held under the supervision of the  *  *  *  Regional Director" who should certify the result. The regional director held an election two weeks later—i. e., on October 25th—at which 68 valid ballots were cast, 52 against the Union and 16 in favor of it; however, he did not certify the result for four months, i. e., until March 20, 1952; and the certificate that he then did issue declared only that a majority of the valid ballots had not been cast for the Union, and that it was not the exclusive representative of the employees.

The reason for this delay was what had taken place before the election on October 25th and afterwards. After the parties had agreed on October 11th to hold an election, the respondent called nine meetings before the 25th—each with one of the nine "departments" of the respondent—at which, in the words of the examiner, the president "opened each meeting by giving" a "speech  *  * and then conducted a question and answer period in which he considered and discussed questions, suggestions and complaints of the employees." The content of the speeches referred to is too long to quote, and some of it was within the privilege granted under § 8(c), being no more than the expression of the president's "views, argument, or opinion" without "threat of reprisal or force

or promise of benefit." But there was much that was not so limited. For example, he said that, although "he could not promise any additional bonuses or wage raises," he "read to them the letter of the Company sent the employees with the 1950 bonus, in which it advised that that small bonus was the best it could do at that time, but expressed the hope that it would be larger." He added that the company was considering further improvements in the profit-sharing plan then in force. He said he would improve the "incentive system," though he could not say what definite ideas he had in mind for doing so. At another time in answer to a suggestion for better inspection of machines, he said that perhaps there ought to be an additional inspector; and again and again he discussed grievances that the employees raised at the meeting. In some cases he indicated that he would consider these complaints and a few he actually remedied. Although the regional director had not reported on the election, on the 29th of October the Union filed an objection to it, which, however, it withdrew on March 6, 1952, when it substituted the charge on which the present complaint was later founded. Meanwhile the respondent began to hold regular monthly meetings of the employees throughout the winter, and until at least May of 1952. These were meetings of the employees of all the departments, and were an established institution of the respondent under the title: "The Monthly Meetings of All Departments." These meetings followed in general the same pattern as the nine meetings of the several "departments," except that, as we have just said, the "departments" met in one body.

■■ It was upon this evidence that the Board found the respondents guilty, (1) of refusing to bargain with the Union, and (2) of dominating "The Monthly Meetings of All Departments," which was, it found, a "labor organization" under § 2(5) of the Act. As to the first charge the Board held that the respondent's refusal to recognize the

Union as a bargaining agent from the outset was not in good faith; and that the election of October 25th did not cancel employees' choice by cards in September, because of the respondent's improper interference with the employees' free choice by the meetings before October 25th. The second charge the Board supported on the ground that, as we have said, "The Monthly Meetings of All Departments" was a "labor organization" that the respondent had "dominated" within the meaning of § 8(a) (2). We shall begin with this finding; and we agree that, whatever may have been the character of the meetings, called before the election of October 25th, "The Monthly Meetings of All Departments" had become an organization, in which the employees participated and which existed for the purpose, in whole or in part, of dealing with employers concerning grievances or conditions of work. We need not add anything to what we have already said in describing the activities of the meetings. The question whether it did also "dominate * * the formation or administration of" this union is not so clear because the meaning of that word has uncertain fringes. As we have said, the president was solicitous to disclaim any express "promise of benefit," § 8(c), although it is not clear that part of his talk did not justify a finding that such a promise was implied. But it is not necessary to decide how far to press this element, for there may be "domination" without promise of benefit, direct or indirect. Although one may indeed be said to "dominate" another by the force of his superior intelligence, or, more vaguely, of his generally coercive personality, the Act does not of course include that. But collective bargaining is an activity, presupposing that the employees shall have opportunity in the absence of the employer to canvass their grievances, formulate their demands in common, and instruct an advocate who they believe will best press their suit. It is one thing to speak collectively through one who urges claims of which he is not the author, and for presenting which he is not so likely to be made the object of reprisal; it is another to rise in a gathering, not unlike a town meeting, and argue claims of one's own devising, or even those of the group as a whole. The Act took over trade unionism as it has developed; it presupposed a champion chosen by one faction to a controversy, and charged with the duty of securing victory. Perhaps that may be a mistaken way to promote industrial peace; but with that we have nothing to do. The language used by Parker, C. J., as to the selection of such an advocate [1] applies as well to collective bargaining without any advocate: "Collective bargaining becomes a delusion and a snare if the employer, either directly or indirectly, is allowed to sit on both sides of the bargaining table; and, with the great advantage that he holds as the master of pay and promotions, he will be on both sides of the table if he is allowed to take any part whatever in the choice of bargaining representatives by the employees."

■ There remains the second question: i. e., whether the respondent should recognize and treat with the Union as the bargaining representative of its employees. We need not decide whether it was bound to accept the claim in the Union's letter of September 20, 1951, that it had secured a majority. It is not essential that the respondent's answer of September 25th was written in bad faith; for even if it was not, the subsequent course of events imposed upon the respondent the duty to accept the Union. Indeed, we will assume that, if it had remained neutral and in good faith in doubt until the election of October 25th, its refusal in good faith to await the election would not have been a violation of § 8(a) (5). National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 868. But it did

1. American Enka Corp. v. National Labor Relations Board, 4 Cir., 119 F.2d 60, 62, 63.

not remain neutral. Between October 11 and October 25 it held the nine meetings of the separate "departments," that we have described; and it is certainly possible that it was these that lost the Union its majority. The Board is the tribunal to determine the effect of what was done upon the minds of the employees who were present at those meetings. This was authoritatively settled in Franks Bros. Co. v. National Labor Relations Board, 321 U.S. 702, 64 S.Ct. 817, 818, 88 L.Ed. 1020, where the Board ordered an employer to bargain with a union, although the original majority had been reduced to a minority after the charge was filed and before the complaint was filed; and where in the interval the employer had engaged in "unfair labor practices." The Court affirmed the Board's order because the Board had found that " 'the only means by which a refusal to bargain can be remedied is an affirmative order requiring the employer to bargain with the Union which represented a majority at the time the unfair labor practice was committed.' " Indeed, that was only another facet of the doctrine that the Board alone may decide how long the results of an earlier unfair practice have persisted, and how far they will contaminate, so to say, a union organized after they have ended. The immunity of the Board's conclusions from judicial review on such occasions is a consequence of its putative specialized experience in the field of labor relations: an experience that is thought to enable it to appraise causes and consequences that escape the perception of those less widely acquainted with those relations.[2] Thus, we accept the conclusions of a specialized tribunal, made upon evidence that would not prove them to an ordinary, or "lay," court, so to say. This involves imputing to the specialized tribunal an access to valid general propositions which make sequences causal that are not causal to untutored minds. Pro tanto, it involves an abdication by the "lay" courts, and there is no general principle to solve the antinomy of their retaining any review whatever. Indeed, in the case of highly specialized persons: e. g., chemists, engineers or physicians, we do abdicate except as they contradict each other, and we are frankly forced to guess. In the case at bar the examiner, and the Board, found that, not only were the respondent's practices "calculated to * * * exert a telling effect to turning the men against the Union," but that they "did" so. There is not the proverbial scintilla to justify the last conclusion; a "lay" mind would say no more than that they may well have done so; and, since the General Counsel has the burden of proof and the evidence, being neutral, the finding would fail. On the other hand it is well settled that it must not fail, because we are to attribute to the Board an acquaintance with phenomena in this field, out of which it was reasonable to draw the conclusion that such practices in fact ordinarily do cause a change of votes. We know of no differentia that will tell us where to stop in imputing to the Board such implied major premises, and indeed, it is just at this point in the whole conduct of administrative tribunals that we are obliged to proceed from occasion to occasion without the guidance of any general rules. From the foregoing discussion it appears that the Union was the duly accredited representative of the employees from September, 1951, forward.

██ An order will therefore pass enforcing paragraph 1(a), 1(b), 1(c), 2(a), 2(b) and 2(c) of the Board's order. There remain paragraphs 1(d) and 1(e), of which the General Counsel does not ask enforcement of the following clause of 1(d): "making antiunion speeches to its employees during working hours on its premises in the course

**2.** National Labor Relations Board v. Standard Oil Co., 2 Cir., 138 F.2d 885, 887; National Labor Relations Board v. Century Oxford Mfg. Corp., 2 Cir., 140 F.2d 541; Independent Employees Association v. National Labor Relations Board, 2 Cir., 158 F.2d 448, 453, 454.

of an organizing campaign by a labor organization, without according, upon reasonable request, a similar opportunity to address the employees to such labor organization against which such speeches were directed". The remainder of that paragraph seems to us proper; it is only a more or less generalized statement of the specific unfair practices in controversy; all the acts enjoined are conditioned upon the existence of "an organizing campaign of an affiliated labor organization and for the purpose of defeating such organizing campaign or while such affiliated organization represents a majority of employees." The objection to paragraph 1(e) raises the recurrent question of the scope of the decision in National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930. The opinion declared, 312 U.S. at page 437, 61 S.Ct. at page 700, that "to justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated"; and in National Labor Relations Board v. Cheney California Lumber Co., 327 U.S. 385, 66 S.Ct. 553, 90 L.Ed. 739 the Court held that it was too late to raise that question after the Board had entered its order. Here the respondent included paragraph 1(e) among its exceptions only in the following language: "To the 'Recommendations' set forth at pages 34, 35 and 36, but particularly the recommendations set forth in paragraph 1(a) * * * and * * * 2 (a). * * * The other recommendations are meaningless and in fact ridiculous because if adopted by the Board they would require the Respondent to stop doing what the Respondent is not doing." We do not think that this was an adequate exception to paragraph 1 (e).

An enforcement order will pass on all parts of the Board's order, except so much of paragraph 1(d) as the General Counsel does not ask to have enforced.