BILTON INSULATION, INC.,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 8315.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 5, 1961.
Decided Dec. 9, 1961.

Henry St. J. FitzGerald, Alexandria, Va. (C. Wynne Tolbert and Tolbert, Lewis & FitzGerald, Arlington, Va., on the brief), for petitioner.

Morton Namrow, Atty., N. L. R. B. Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Samuel M. Singer, Atty., N. L. R. B., Washington, D. C., on the brief), for respondent.

Before SOBELOFF, Chief Judge, and SOPER and BRYAN, Circuit Judges.

SOPER, Circuit Judge.

This case comes before the court upon the petition of Bilton Insulation, Inc. to review and set aside an order of the National Labor Relations Board issued in a proceeding in which United Construction Workers, Division of District 50, United Mine Workers of America, charged the Company with unfair labor practices in violation of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.

Bilton Insulation, Inc. is a Virginia corporation which has a plant in Arlington, Virginia, where it is engaged in the business of supplying insulation in houses and employs 30 skilled and unskilled workers exclusive of clerical workers and professional supervisory em-

ployees. In August and September 1959 the Union engaged in organization activities at the plant and by September 17 had secured authorization cards from 24 of the 30 workers designating the Union as their bargaining representative. On that day O. B. Allen, the Union organizer, went to the office of Adolph Bilton, the Company's president, in order to secure recognition of the Union. What took place in the conference between the two men was the subject of dispute in the testimony given by them at the trial of the charges before an examiner. Allen testified that he informed Bilton that the majority of the employees had signed union cards and requested that the Company recognize the Union and enter into negotiations with it; but Bilton refused and said he would liquidate the business rather than recognize the Union and after a few minutes Allen left. Bilton on his part denied that Allen told him that a majority of the men had signed for the Union or that he had any dealings with them but only that he would like to organize a union; and aside from that the talk between them consisted of Bilton's explaining that he himself had been a union man and believed in unions but that he could not compete successfully and would be forced out of business if the business was unionized, to which Allen replied that he had heard that kind of talk before whereupon Bilton ordered him out of the office. The examiner who heard the evidence accepted Allen's version of the meeting as correct and his finding was expressly adopted by the Board. Since this finding was supported not only by Allen's explicit testimony but by inferences that may fairly be drawn from Bilton's subsequent conduct, the Board's conclusion is binding upon this court.

The story of the subsequent events is in the main undisputed. On September 22 the Union filed a petition with the Board for an election, supported by authorization cards signed by 24 employees, and sent a copy of the petition to the company, as well as a letter wherein the Union demanded recognition as the bargaining representative of the workers. This letter was received by the Company on September 23rd but was ignored. On the morning of that day nearly all of the employees who had joined the Union appeared wearing union buttons when they reported to work. The general manager ordered the workers to remove the buttons if anyone wanted to work but after some dispute it was arranged that the matter would be discussed later in the day and some of the workers continued to wear the buttons. Hearing of this event Allen went to the plant to be present at the meeting.

Meanwhile Bilton, realizing from the button episode that the men had some arrangement with the Union, left the plant and spent a large part of the afternoon in conference with his lawyer to familiarize himself with the legal aspects of the case. Returning to the plant late in the afternoon he found Allen on the premises and peremptorily ordered him to leave and sent for the police. After Allen left Bilton was given the Union letter of September 22. (The copy of the Union petition for an election was received the next day.) Thereupon he and his general manager and his superintendent had a conference with the workers in which Bilton told them that it was their privilege to join or not to join the Union but if they joined and he was compelled to grant very many additional benefits to them he would be forced out of business by his competitors. (The Board held that Bilton was within his rights in making this statement.) It was then decided that Bilton would meet at a later date with a committee of the workers which had previously been appointed to present their problems to the management.

This meeting was held on September 26 at which various working conditions were discussed and agreements between the management and the men were reached with respect to an increase in the rate of pay, additional compensation for difficult assignments, vacations with pay and other benefits, all of which were put into effect immediately. After the meeting it

was proposed that the employees withdraw from the Union and one of the committee was given the aid of a secretary and the facilities of the office at the plant to prepare a letter to be signed by the employees notifying the Union that its services as bargaining agent were no longer desired. The next morning this letter was placed on the superintendent's desk where it could be seen and signed by all of the employees when the manager gave them their work assignments for the day. He read the letter to a group of the employees and urged them to sign it and it was signed by all of the union men on that or the following day. Subsequently the Union withdrew its petition for an election.

Upon this state of facts it was found by the Board that the Company had engaged in unfair labor practices and it was ordered to cease and desist from refusing to bargain collectively with the Union and from threatening its employees with discharge for wearing union buttons and from assisting its employees in preparing the letter to be signed by them and from interfering with the employees in the exercise of their right to bargain collectively through representatives of their own choosing.

■■■■ The Company bases its petition for review very largely on the contention that the evidence did not justify the finding that Bilton was informed by Allen on September 17th that the Union was seeking recognition as a bargaining agent based on the authority given by a majority of the workers. We think, however, that the finding was amply justified. The Board not only had the explicit testimony of Allen but could reasonably infer from the events which followed in the next few days that Bilton was aware of the true situation and was determined to eject the Union from the plant. On September 23, as we have seen, nearly all of the union men wore union buttons when they entered the plant and Bilton received the Union's letter demanding recognition which showed that the Union claimed to represent a majority of the workers. On the same day Bilton ordered

Allen from the premises, warned the men that unionization might force him to close the plant and arranged to meet a committee of the workers to discuss their problems. On September 26th at such a meeting the demands of the men were met and they were induced to withdraw their membership in the Union. Obviously there were grounds for the conclusion of the Board that the employer, with the knowledge and belief that the Union represented the majority of the workers, refused to bargain with it. The president of the Company had not only been told orally and in writing that the Union represented a majority of the workers but he also had knowledge that nearly all of the workers wore union buttons on September 23rd and was so impressed by this evidence of union membership that he went to his lawyer for advice. It is not disputed that 24 of the 30 men had actually signed the authorization cards as early as September 17 and the subsequent events fully warrant the inference that Bilton had knowledge of this fact. The refusal to bargain with the Union, fully established by these circumstances, was a violation of Section 8(a) (5) of the statute. The choice of a union as a bargaining representative may be shown by authorization cards signed by the workers without an election conducted by the Board. United Mine Workers of America v. Arkansas Oak Flooring Co., 351 U.S. 62, 74, 76 S.Ct. 559, 100 L.Ed. 941; N. L. R. B. v. Greensboro Coca Cola Bottling Co., (4th Cir.) 180 F.2d 840; and the filing of a representative petition by a union does not absolve an employer from his duty to recognize and bargain with the union in the absence of a bona fide doubt on his part as to the union's majority status. N. L. R. B. v. Inter-City Advertising Co., (4th Cir.) 190 F.2d 420, cert. denied 342 U.S. 908, 72 S.Ct. 301, 96 L.Ed. 679; N. L. R. B. v. Ken Rose Motors, Inc., (1st Cir.) 193 F.2d 769, 771; Joy Silk Mills, Inc. v. N. L. R. B., 87 U.S.App.D.C. 360, 185 F.2d 732. Furthermore, the Board has the power to order an employer to bargain collectively with the union which

has lost its majority after the employer has wrongfully refused to bargain with it. Franks Bros. Co. v. National Labor Relations Board, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020; Brooks v. N. L. R. B., 348 U.S. 96, 102–103, 75 S.Ct. 176, 99 L. Ed. 125.

The Company's affirmative acts in bargaining directly with the men after they had become members of the Union was a violation of Section 8(a) (1) of the statute for it is the duty of an employer to deal only with the designated representative of the employees. Medo Photo Supply Corp. v. National Labor Relations Board, 321 U.S. 678, 683–684, 64 S.Ct. 830, 88 L.Ed. 1007.

There is no substance in the additional contention of the employer in this case that it was lawful for it to negotiate with the committee of the employees under Section 9(a) of the statute. This section specifically provides that representatives selected by the majority of the employees for the purposes of collective bargaining shall be the exclusive representatives for the purpose of bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment, provided that any group of employees shall have the right to present grievances to the employer and have them adjusted as long as the adjustment is not inconsistent with the terms of a collective bargaining contract then in effect, if the bargaining representative has been given the opportunity to be present. It is clear that in this instance the terms of the statute were violated since the negotiations between the employer and the men related to conditions of employment and were conducted in the absence of the representative in whom exclusive authority to negotiate was vested. The interpretation placed by the employer upon the proviso in the section would completely frustrate the purpose for which the statute was enacted.

That part of the order of the Board which directed the employer to cease and desist from threatening the employees with discharge for wearing union buttons was justified since the actions of the employer in this respect were incident to his purpose to ignore the Union as the authorized representative of the men. See Republic Aviation Corp. v. N. L. R. B., 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372; N. L. R. B. v. Security Warehouse & Cold Storage Co., (9th Cir.) 136 F.2d 829, 832.

We find no error in the order of the Board and, accordingly, the petition of the Company will be dismissed and the order of the Board will be enforced.