**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Harold W. KOEHLER, Harold C. Koehler, and Jerry Koehler, Partners, d/b/a Koehler's Wholesale Restaurant Supply, Respondents.**

**No. 14285.**

United States Court of Appeals Seventh Circuit.

Feb. 24, 1964.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Solomon I. Hirsh, Attorney, N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Gary Green, Attorney, N. L. R. B., for petitioner.

John D. Raikos, Richard P. Tinkham, Jr., Indianapolis, Ind., James K. Sommer, Indianapolis, Ind., Briggs, Berner, Sommer & Tinkham, Indianapolis, Ind., of counsel, for respondent.

Before DUFFY, SCHNACKENBERG and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This case is here upon petition of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, as amended (61 Stat. 136, 73 Stat. 519, 29 U.S.C.A. § 151 et seq.), for enforcement of the Board's order issued against respondents on November 15, 1962, following proceedings under Section 10 of the Act. The Board's Decision and Order are reported at 139 NLRB 945.

The Board approved the findings of the Trial Examiner, from which it was concluded that respondents violated Sec. 8(a) (1) and (2) of the Act by coercing employees to refrain from joining a union of their choice and to join, instead, Koehler's Employees Union (hereinafter called KEU), and by dominating and interfering with the administration of KEU and contributing financial and other support to it. The Board also found that respondents violated Sec. 8(a) (3) of the Act by contracting with KEU to pay certain fringe benefits exclusively to its members, and Sec. 8(a) (5), by refusing to bargain collectively with the employees' majority representative. Respondents on brief concede that they engaged in conduct violative of Sec. 8(a) (1) of the Act, and do not challenge the Board's finding of a violation of Sec. 8(a) (3). They contest the Board's findings of a violation of Sec. 8(a) (2) and (5).

In view of the situation thus stated, there is no occasion for a recitation of much of the testimony heard by the Trial Examiner. The record is convincing that substantial evidence supports the Board's findings in all respects except that pertaining to a violation of Sec. 8(a) (5), refusal to bargain collectively with Local 135, International Brotherhood of Teamsters (hereinafter called Teamsters). A resolution of this issue is dependent upon whether there is substantial evidence in support of the Board's finding that Teamsters occupied a majority status of the appropriate unit at the time it sought and was refused recognition by respondents.

KEU, an independent union, had represented Koehler's [1] employees since 1959. The constitution and by-laws of KEU were drafted by John D. Raikos, the attorney for respondents, who also acted as such for KEU. Early in 1960, KEU and respondents executed a 3-year "bargaining agreement." Membership was not compulsory, and Jerry Koehler and respondents' office manager Rust were permitted to join. From January to September, 1961, Charles Shearer, a department supervisor and son-in-law of Harold Koehler, was president. Employees each paid dues of $1.20 per year, and most were participants in a mutual benefit fund to which each contributed $1.00 per week and to which respondents contributed $2.50 per member each week. Of the latter amount, 25¢ per month was paid directly to KEU. KEU received the proceeds from the coke vending machine on respondents' premises, free use of respondents' office facilities, and free legal advice from Raikos. The by-laws provided for the forfeiture of benefits by an employee if he refused to work in protest of any grievance without giving respondents one week's time to correct the grievance.

In the summer of 1961, dissatisfaction developed among employees, primarily relating to wages, respondents' failure to pay their Blue Cross health insurance premiums and the conduct of supervisor Maurice Hey. By late summer, KEU had become inactive, with two vacancies on its committee. As one employee stated, the company union had just "fizzled" and gone "to pot." About October 1, 1961, some employees became interested in Teamsters. Led by truck drivers Robert Simons and Jerry (Pete) Williams, 22 of respondents' employees, on October 2 and 3, signed cards which recited that the signer applied for membership in

1. The company consisted of three partners: Harold W. Koehler and his sons, Harold C. (Charley) and Jerry Koehler.

Teamsters and designated it as his bargaining representative. The appropriateness of the unit which included 38 employees is not in dispute.

On October 5, Harry Berns, local representative of Teamsters, telephoned respondents, announcing majority support and requesting recognition (20 was a majority, and he claimed to have cards signed by 22). Berns was referred to Raikos, who expressed disbelief in Teamsters' claim. Respondents denied Teamsters' request for recognition, and the latter filed a representation petition with the Board, which set November 28, 1961 as the date for an election. On November 24, Teamsters filed the instant unfair labor practice charge against respondents. The Board thereupon postponed and subsequently dismissed the scheduled election, pending disposition of the charge.

Whether Teamsters at the time it sought recognition held authorization cards from a majority of respondents' employees is the critical issue. The Board, with one member dissenting, affirming the finding of its Trial Examiner stated:

"On the record before us, we fail to see how it can be said that the cards which the Union obtained lacked reliability in establishing the Union's claim to representative status."

The dissenting member stated:

"I do not believe that the cards offered by the General Counsel to show such majority status are reliable for this purpose."

We know of no court decision which has set aside the finding of the Board that a union acquired majority status by authorization cards; however, the issue has been raised in a number of cases. Nearest in point perhaps is NLRB v. Stow Manufacturing Co., 2 Cir., 217 F.2d 900, wherein the contention of the employer was the same as it is here. The Court stated (217 F.2d at page 902):

"In spite of this unequivocal language [that contained in the cards] the respondent argues that at least five of the cards should not be counted because the signers supposed that they were only asking that an election should be called at which they would vote for or against the Union as they then pleased."

The Court pointed out that even though the five cards were eliminated, the Union would still have a majority of one, but that it could only find three employees "who said that they understood the cards not to be votes for the Union," and concluded, "[W]e cannot say, in the face of the express language of the cards themselves, that the examiner's finding that a majority meant to make the Union their representative was not supported by substantial evidence." Another case of similar purport is NLRB v. Gorbea, Perez & Morell, S. en C., 1 Cir., 300 F.2d 886, which sustained the finding of the Board relative to authorization cards, but pointed out (page 887), "There was no claim of affirmative misrepresentation by the union."

In Englewood Lumber Company, 130 NLRB 394, the Board refused to accept authorization cards as proof of majority status. In its opinion the Board stated:

"As set forth in more detail in the Intermediate Report, the union did not tell the employees that by signing cards they were authorizing the union to represent them; rather, the employees were told that the cards were necessary in order that the Board might conduct an election by a secret ballot in which every employee would have an opportunity to express his preference. Ten employees who had signed cards testified that when solicited they were told that the cards were for a Board election. * * * we do not think it can reasonably be said that the employees, by an act of signing authorizations thereby clearly manifested an intention to designate the union as their bargaining representative."

Simons and Williams obtained the authorization cards. The Board majority and its dissenting member rely in the

main upon their testimony to support opposing results. We have read the testimony bearing on the issue under discussion and we conclude without hesitancy that the Board's finding is clearly erroneous. In support of this conclusion, we can do no better than quote the reasoning of the dissenting member:

"The testimony of both Simons and Williams makes it clear that in inducing employees to sign Teamsters' cards, they led them to believe that the purpose of the cards was to obtain an election—not to authorize the Teamsters to bargain for them. Thus Simons testified he told the employees that by signing the cards they were not selecting the Teamsters as their bargaining agent, that they would have a chance to vote at a secret election, and that they could vote for the Teamsters Union or against it. It was explained to the employees that the cards were needed in order to get the opportunity to vote. Williams similarly testified that all of the employees knew that the cards were 'not to get a Union in there, it was just so there would be a vote to see if a Union would get in there.' The testimony of Simons and Williams was corroborated by that of employees DuBecky and Garrett, both of whom signed after being told the cards were just for the purpose of obtaining an election."

Further, employee Ralph Richards testified that he did not "particularly want the Teamsters there," and when he signed the card he did not intend what the card said and he thought "they were just trying to scare Koehler into giving us a raise." The bizarre nature of Simons' conduct is aptly illustrated by his admission, "We crossed Koehler's, and then we turned around and crossed the Union. Then we turned around and crossed Koehler's again, * * * and went back from the Teamsters, back onto Koehler's side."

Respondents make other points relative to the authorization cards. It is asserted that one card was not signed by the employee whose signature it bore, that another bore a typewritten signature, that a third was dated in January 1962, long after recognition was sought by Teamsters, and that their cards should be eliminated, leaving only nineteen cards, one short of a majority. We need not discuss the contention as to these cards in view of the overwhelming proof that many employees signed cards because they were promised that such cards were to be used for the purpose of obtaining an election, with a secret ballot, to be conducted by the Board.

We hold, therefore, that the record does not support a finding that Teamsters at the time it sought recognition represented a majority of respondents' employees in the unit in question. It follows that the Board's conclusion that respondents violated Sec. 8(a) (5) of the Act by its refusal to bargain with that union must be rejected. Thus, we need not consider the much discussed issue as to whether respondents' refusal to bargain was in good faith. That issue could be material only if Teamsters had occupied a majority status when it sought recognition.

The fact, however, that Teamsters was not entitled to recognition as the bargaining agent for the reason that it did not represent a majority is of no aid to respondents on the charge that KEU was a company dominated union. We have heretofore set forth in abbreviated form some of the facts concerning the organization of KEU and the relation which it sustained with respondents. Without going into further detail on that phase of the testimony we think there is little doubt but that KEU was from its inception a company dominated union in violation of Secs. 8(a) (2) and (3) of the Act. Any doubt which might exist on this score is completely dispelled by respondents' conduct, activities and treatment accorded KEU subsequent to the time Teamsters sought and was denied recognition. On October 9, 1961 (recognition of Teamsters was denied

October 5), appointments to fill committee vacancies were made, with the approval of Harold Koehler. At that time he stated that someone was "putting a knife in his back," that he wanted to find out who was on his side and "to get rid of" those who were not. Koehler prepared a statement purported to be an employee designation of KEU as exclusive bargaining representative. He told committeemen that KEU "was like an instrument, it just lay there and nobody ever used it, and it was time we got things started to get together and start working things out * * *." He added that he would not sign a contract with any union except KEU, and threatened to discharge employees who refused to cooperate. Committeemen circulated the statement, telling the employees of Koehler's threats and assuring them that signing the statement "didn't mean nothing." All employees signed the statement. Koehler told his employees on numerous occasions that he would sell the business rather than deal with Teamsters.

Charley Koehler approached a number of employees to inquire whether they had signed Teamsters' cards, whether they supported KEU, what grievances they had and which employees were leading Teamsters' organizational drive. He also visited homes of numerous employees, informing them that his father and brother were prepared to shut down the plant if Teamsters won the election. On November 20, 1961, he visited the president of KEU at his home and told him that respondents would not sign a contract with Teamsters because they had "worked too hard to let a bunch of foreigners in there," but that they were "ready to write a contract with the employees."

At Charley Koehler's suggestion, a number of employees, including Williams and Simons, went to his home, where he told the group that he knew he was breaking the law by making them promises but in order to keep Teamsters out

and save the business from being sold, he would agree to a new contract with KEU. He then proposed a contract with KEU which provided for substantial benefits. They all agreed that this new contract was secret and conditioned upon Teamsters losing the election. On the next day the proposed contract was written by attorney Raikos and executed by the KEU committee, who authorized Raikos to destroy it if Teamsters won the election. After the unfair labor practice was filed by Teamsters and the election cancelled by the Board, Harold Koehler announced at an employee meeting that the "secret" contract would now become effective, that anybody who "can't go all the way out for Koehler's" should get his check at the office and that respondents would find him another job. This agreement, with some implementation, has since been in effect.

■ Respondents argue, without merit we think, that the Board's order disestablishing KEU was improper even though it was a company dominated union. It was within the Board's discretion to fashion the remedy appropriate to the situation. NLRB v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 250, 60 S.Ct. 203, 84 L.Ed. 219. We cannot say that the Board abused its discretion in this respect.

Respondents also complain of the propriety of a provision in the Board's order relative to a reimbursement of dues, together with interest thereon. We see no reason to disturb the Board's order in this respect.

The Board's petition for enforcement of its order is allowed, with the following modifications: strike Paragraph 1 (a), which requires respondents to cease and desist from refusing to bargain with the Teamsters Union; strike Paragraph 2(a), which requires respondents upon request to bargain collectively with the Teamsters Union, and change notices required to be posted by respondents to conform with the modified order.