CRAWFORD MANUFACTURING CO., Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Amalgamated Clothing Workers of America, AFL–CIO, Intervenor.

No. 11040.

United States Court of Appeals Fourth Circuit.

Argued May 31, 1967.

Decided Oct. 27, 1967.

Clifton L. Elliott and Harry L. Browne, Kansas City, Mo: (Spencer, Fane, Britt & Browne, Kansas City, Mo., Marion A. Prowell, Constangy & Prowell, Atlanta, Ga., M. Wallace Moncure, Jr., and Moncure & Cabell, Richmond, Va., on brief) for petitioner.

Burton L. Raimi, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Lawrence M. Joseph, Atty., N. L. R. B., on brief), for respondent.

John E. Philbin, Chicago, Ill. (Jacob Sheinkman and Clifford D. Reznicek, New York City, on brief) for intervenor.

Before SOBELOFF, BRYAN and WINTER, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

The National Labor Relations Act, 29 U.S.C. § 151 et seq., was breached, the Board has found, by the Crawford Manufacturing Company, Inc. at its plant in Emporia, Kansas, in this conduct: interfering with employees in the exercise of their right to organize; discouraging membership in a union by discriminatory

lay-offs; and inexcusably refusing to bargain collectively with Amalgamated Clothing Workers of America, AFL–CIO, as the exclusive representative of the Crawford employees.[1] These acts were laid, respectively, as offending Sections 8(a) (1), 8(a) (3) and 8(a) (5) of the Act.[2]

■ To effectuate these findings, the Board ordered the employer to desist from further interference and discrimination; to make reparation for the lay-offs; and to bargain with the union. On the parties' cross-petitions, we must say whether substantial evidence on the whole record sustains the Board's condemnation of the employer on all counts. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The interference is adequately proved, we think, but not the discrimination in the lay-offs. Nor do we think Crawford should have been ordered to bargain with the union, for it was not substantially proved to be the employees' representative.

A drive to bring into the ACWA the 172 production and maintenance employees of Crawford at Emporia was opened in December 1964. On January 7, 1965 Jay Dee Patrick, a national representative of the AFL–CIO, distributed folders, each including an application to join, as the workers entered the plant parking lot. The following day General Manager Jones addressed employees from a prepared text, listing the benefits they were receiving from the company and expressing opposition to any unionization.

On January 12 the employees met for the first time for a discussion of the ACWA, with about 75 present. Patrick and Edward Bonitt, a national representative of ACWA, addressed them, explained the structure of the local and national organizations, and at the same time noted a number of advantages of a union. Membership application cards were distributed; an organizing committee was appointed and met with Patrick and Bonitt after adjournment. At the committee meeting questions and answers about the ensuing campaign were exchanged.

By January 18 the union had obtained more than 100 signed cards. On that day Patrick wrote the company stating that a majority of the production, shipping, receiving and maintenance employees had designated ACWA as their collective bargaining agent. He requested an opportunity to demonstrate this authorization and to negotiate a contract on behalf of the employees. The company replied, in a letter dated January 20, that the matters submitted by the union should be "processed through the National Labor Relations Board." During the two days before this reply, the company sent a letter to each employee and issued releases, reiterating the perquisites provided by the company and questioning the advisability of bringing in a union.

The union was busy too. On January 19 Patrick told a gathering of some 72 employees that with authorization cards in hand he had demanded union recognition from the company. At the same time he had lodged with the National Labor Relations Board a petition for an election, anticipating the company's denial of his demand. On the later hearing of the union's petition the company assented to a Board-conducted election for March 26. A spirited campaign followed, with arguments and solicitations presented in letters and leaflets. On the final tally the union lost, 69 to 86, with 8 votes challenged.

The complaint in this case, issued on June 18, 1965, charged the company with unfair labor practices in the campaign, consisting of coercive threats and interrogation sufficient to invalidate the election, and indicted the company for refusing to recognize the union as the employees' representative on the basis of the signed cards.

---

1. Jurisdiction here rests on the fact that the company's principal office is located in Richmond, Virginia. 29 U.S.C. § 160.

2. These sections are codified as 29 U.S.C. §§ 158(a) (1), 158(a) (3) and 158(a) (5) respectively.

*Section 8(a) (1) Infractions*

■ Confirming its examiner, the Board found that Supervisor Drumwright questioned certain employees about the union meetings and made anti-union remarks. It found also that Superintendent Jenks called two of the organizing committeemen into his office in the early part of March 1965 and impressed upon them the possibility of the loss of current benefits should the union succeed in the election. He engaged other employees in similar conversations. These instances are illustrative of the conduct disapproved by the Board and warranted, we think, the Board's findings of interference and coercion transgressive of Section 8(a) (1).

*Section 8(a) (3) Infractions*

■ On February 19, 1965, the day after the consent election had been arranged for March 26, 8 employees from various plant departments were laid off. The reason given by the company was a slack period of work. It said, too, that these employees held the lowest seniority and would be recalled as soon as practicable. All but one had signed a union card, and all were called back soon after the election. Three of the 7 returned; the others did not, one because he had entered military service.

The Board rejects the justification offered by the company, particularly in view of the union sympathies of the men and the anti-union disposition of the employer. However, we see no acceptable basis for this discredit of the company. Its officers testified to the business slump and cited company records in corroboration. We discern no falsification here. Even if mistaken, it was a managerial judgment not impeached as mala fide. None of the suspended employees were replaced by male substitutes, although some additional female workers were taken on during the lay-off. Those released had not been hired for more than four months before, and indisputably their seniority was lower than that of any other workers.

*Section 8(a) (5) Infraction—Refusal to Recognize the Union*

Acknowledgment of its representation, the union forcefully argues, was required of the company when at least 100 and possibly 105 of the total of 172 employees had on or before January 20, 1965 signed membership applications, and the company advised of this majority. Each of the cards reads as follows:

APPLICATION FOR MEMBERSHIP
*in the*
Amalgamated Clothing Workers
of America,
AFL–CIO
1627 LOCUST ST. ST. LOUIS, (3), MO.
CEntral 1–9329

I, the undersigned, hereby apply for membership in the Amalgamated Clothing Workers of America, and do hereby appoint and authorize the officers thereof, to represent and negotiate for me in all matters, pertaining to wages, hours and other conditions of employment.

*Name (Please sign)* : ..............
*Address* : .....................
*Telephone Number* : ...... *Date* : ....
*Company* : ......................
*Department* : ...... *Operation* : .....

The company contends that these cards did not count because they were signed under a misrepresentation of the union: that the purpose of the card was only to have an election to determine whether the employees desired the union to become their bargaining representative. It was not understood by the employees, the company urges, as an immediate authorization to the union to act as their collective agent. The Board has in the past quite frankly conceded that a card signed under the representation that its *sole* purpose was to obtain an election should not be accepted as an appointment of the union. Bauer Welding and Metal Fabricator's, Inc. v. NLRB, 358 F.2d 766, 775–776 (8 Cir. 1967).

The company's position is supported by the findings of the Board's examiner. From an experienced feel of the evidence in the case, he sensed that the employees misunderstood the meaning of the cards.

Adverting to the first meeting of the employees, January 12, he said:

> "In answering questions Patrick assumed that the Company was going to insist upon an election and consequently made frequent references to the election. These references to the election which Patrick anticipated would be held and his explanation that in the election, no one would know how he voted, neither the Union, the Company, nor their fellow employees would know, I find, *were interpreted by some of the employees at the meeting as indicating that the cards would be used only for the purpose of obtaining an election.* There is much testimony concerning whether Patrick did or did not make such statements at this meeting. * * *" (Accent added.)

Again, to the organizing committee Patrick's statements were to the following effect, the examiner noted:

> "Patrick answered, I find, that the cards would be used first to obtain an election, that *the signers of the cards would not be joining the Union at this time,* that this would be deferred until after the Union had won the election and had succeeded in negotiating a contract satisfactory to the employees. * * *" (Accent added.)

Still again he observed:

> "As indicated above, I further find accordance with the testimony to which I have referred, that when at the subsequent meeting of the organizing committee the question was raised as to the binding effect of the cards, Patrick explained that the cards would be used first to obtain an election, that the signers of the cards would not be joining the union at this time, that this would be deferred until after the Union had won the election and had succeeded in negotiating a contract satisfactory to the employees. In making this finding I do not wish to imply that Patrick conveyed this idea to all his hearers without any confusion on their part. *It is clear to me that much confusion existed in the minds of the employees, including some mem-*

*bers of the organizing committee,* and that some genuinely believed that Patrick had expressly stated that the *cards would be used only for the purpose of an election* and no other purpose. * * *" (Accent added.)

At the very least, the findings of the examiner and the testimony of the employees make an issue of whether the cards were signed as a power to the union to act for the employees. Put the other way, the issue is made whether the cards were signed solely to procure an election.

■ On the question whether the cards evidenced an intentional and intelligent authorization by a majority of the employees to the union to represent them, we think the burden of proof was on the General Counsel of the Board. Engineers & Fabricators, Inc. v. NLRB, 376 F.2d 482, 487 (5 Cir. 1967); Peoples Service Drug Stores, Inc. v. NLRB, 375 F.2d 551, 556, 557 (6 Cir. 1967). Regardless of where the burden lay, we are obligated to scrutinize the entire record and ascertain whether there is substantial evidence for the Board's finding here that the union, when it demanded recognition, was representing a majority of the employees. National Can Corporation v. NLRB, 374 F.2d 796, 804 (7 Cir. 1967).

The examiner here stated, with ample justification, that there was considerable confusion: some employees thought that by signing the cards they were only calling for an election, and others were confused by the union's representations as to the significance of the cards. Actually, if we spell out of the cards the meaning attributed to them by the examiner—a dual purpose, first the call of an election and then admission to membership—the doubt still lurks, for even then the applicant's membership is, in his own mind, conditioned on a union victory in the election. Proof of such a prevalent and pervading misconception when generated by the union organizers' representations cannot be ignored. It is not decisive that the cards in their terms contained no suggestion that they signified anything less than a direct grant of

authority for the union to act as collective agent for the employees. Despite the regard we hold for the contrary opinion, e. g., NLRB v. Cumberland Shoe Corp., 351 F.2d 917, 920 (6 Cir. 1965) and cases there cited, we will not stick mechanically to the literal phrasing of the cards. A ghost of the parol evidence rule, such literalism subordinates what really counts: the actual understanding of the signers. As was said in NLRB v. Winn-Dixie Stores, Inc., 341 F.2d 750, 754 (6 Cir. 1965), cert. den. 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74:

> "The decisions of the Board as well as the opinions of the courts place more emphasis upon the representations made to the employees at the time the cards were signed than upon the language set forth in the cards. If in fact misrepresentations are made by the union to the employees to the effect that the only purpose of the card is to authorize the union to petition the Board for an election, the card will not be construed to authorize representation, even though it contains language to that effect. N. L. R. B. v. Koehler, 328 F.2d 770 (C.A.7); Englewood Lumber Company, 130 N.L.R.B. 394."

■ In fine, when as here substantial evidence does not show that the employees signed authorization cards free of any misapprehension of their purpose, a union majority entitling the union to representation cannot be said to have existed. Indeed, for the employer to have recognized it in these circumstances would have been a usurpation of the choice of a representative when by Section 9(a) of the Act, the selection belongs to the employees. In the face of such a doubt as presently appears, recognition by the employer is forbidden by law. International Ladies Garment Workers v. NLRB, 366 U.S. 731, 737, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961).

■■ It remains for us to discuss the finding of the Board that the refusal of recognition to the union was not because of a good faith doubt of the union's right to speak for the employees. Ordinarily, if the employer has no genuine doubt of the union's claim of a majority, the refusal will not be valid. This proposition, however, has no force here because substantial evidence does not establish the union's majority. This fact wholly undermines the Board's conclusion, based on the absence of good faith, that the company's refusal was unlawful. As was said in NLRB v. S. E. Nichols Co., 380 F.2d 438, 442 (2 Cir. June 21, 1967), "[L]ack of good faith doubt is immaterial if in fact no majority existed." In accord is NLRB v. Koehler, 328 F.2d 770, 773 (7 Cir. 1964).

In conclusion, it is not amiss to note that the Board itself has expressed distrust in cards. NLRB v. Flomatic Corp., 347 F.2d 74, 78 (2 Cir. 1965). Our Chief Judge Haynsworth has recently quite forcefully demonstrated the unreliability of cards, and soundly inveighed against their unqualified acceptance as the basis of a bargaining order. NLRB v. S. S. Logan Packing Company, No. 10,-355 Decided October 27, 1967).

Having inspected the full record, we are not convinced that the Board's finding has the backing of substantial evidence. There is far too much doubt about the employees' understanding of the cards to permit the conclusion that substantial evidence allows acceptance of the cards for what the union claimed for them. Consequently, we cannot hold that Crawford was required to recognize the union as a qualified demandant to bargain. As the Supreme Court has said: "Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corp. v. NLRB, supra, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

The order of the Board will be enforced insofar as it seeks to correct the Section 8(a) (1) violations; it will not be enforced in respect to the reparations for the alleged 8(a) (3), violations; and

it will not be enforced to compel Crawford to bargain under 8(a) (5).

Enforcement granted in part and denied in part.

SOBELOFF, Circuit Judge (dissenting):

The Board's affirmance of the trial examiner's findings and conclusions is found upon substantial evidence. Consequently, the Board's order should be enforced in its entirety.

While the majority recognizes the "experienced feel" of the examiner and agrees with him that there were serious 8(a) (1) infractions, it inexplicably departs from the examiner's findings on the relatively more important 8(a) (3) and 8(a) (5) violations. As a result, the court administers an ineffectual slap on the wrist of the offending employer for violations of the Labor Act.

The remedy the court grants in this case is virtually meaningless since the unfair labor practices have already achieved their goal, viz., the destruction or at least the chilling of unionization at the particular plant. The only satisfactory cure here is to compel Crawford to bargain under 8(a) (5) and to make appropriate reparations for the layoffs in violation of 8(a) (3).

## I

When a union representing a majority of employees in an appropriate unit demands recognition as exclusive bargaining agent, the employer's refusal constitutes an unfair labor practice unless he has a *bona fide* doubt of the union's claim. NLRB v. Overnite Transportation Co., 308 F.2d 279 (4th Cir. 1962);

Bilton Insulation, Inc. v. NLRB, 297 F.2d 141 (4th Cir. 1961). The majority never reaches the question of the present employer's good faith doubt because *it* doubts the union's majority claim. In the light of the employer's flimsy excuse for suspicion, which was properly rejected by the trial examiner, the only question for our determination on the 8(a) (5) issue is whether substantial evidence supports the *Board's* conclusion that the union did represent a majority of the eligible employees.

On January 7, 1965 union agent Jay Dee Patrick began the organizing campaign at Crawford by distributing to the workers folders labeled "An Invitation To Join" the "ACWA" and containing a detachable application for membership. The very next day, General Manager Jones, in setting forth the company's opposition to unionization, emphatically warned all the employees to "be careful about signing anything." The employees were thus alerted by no less a source than their employer of the importance and seriousness attending their signing any union document.

At the first meeting of employees on January 12, Patrick and Edward Bonitt, another union representative, discussed unionization generally and authorization cards in particular. Bonitt maintained that it was to the employees' advantage to have cards signed by a substantial majority because of the stronger bargaining position in the negotiations the cards would produce. Patrick then explained authorization cards in more detail.

In the explanatory paragraphs immediately preceding the short excerpt quoted in the majority opinion,[1] the trial exam-

---

1. The isolated portion cited by the majority opinion may be misleading if not read in the broader context of the examiner's report. I therefore set out in fuller detail the relevant passages of the trial examiner's decision:

"Patrick said that he wanted to get cards signed by 65 percent of the employees before he approached the Company. He explained that after this was done the Union would request recognition as bargaining agent. Patrick went on to say that if the Company was

agreeable, they would call in some disinterested outside party to check the cards, and that the Company would not find out who signed. Patrick commented, however, that as a rule employers did not agree to grant recognition on the basis of a card check and that generally the Union had to go to an election. Patrick further explained as follows:

* * * an election is a pretty much complicated problem from the standpoint that first we have to get at least 30 per

iner found, and it is apparently uncontested, that Patrick plainly informed the employees that cards would form the basis of a request to the employer for recognition. However, he noted that as a rule employers refuse such a request, thereby necessitating an election. Patrick then proceeded to read aloud the union card, thus emphasizing rather than minimizing the importance of its language.

It is extremely important to note the clear and unambiguous language of the card, which is set out in full in the majority opinion. In unmistakable terms, the signatory applies for union membership and "appoints and authorizes" the union to negotiate as his representative in all matters relating to employment. There are no words even hinting that the sole purpose or any purpose of the cards was to secure an election. Nor was there any such oral representation.

Following his recital of the contents of the card, Patrick distributed cards to the employees together with return envelopes. He did not pressure the employees to sign, but advised them to deliberate their decision and mail the cards, if they so desired, at their leisure.

It was in this setting that Patrick opened the floor for questions. When answering these questions, Patrick referred to an election not because that was the design of the cards but because of his earlier (and accurate) prediction that the employer would probably reject the cards. From a finding that "some" employees misinterpreted Patrick's answer, the majority opinion concludes that "*the* employees misunderstood the meaning of the cards." I find this an unwarranted conclusion, directly contrary to the examiner's explanatory statements and ultimate findings of fact that no misrepresentation was made and that the cards and their solicitation were perfectly valid. In summing up, the trial examiner with the "experienced feel" declared:

"I conclude, as indicated above, that he (Patrick) did not represent either at the general meeting or the later meeting of the organizing committee

cent of the people signed before the government will have an election. Then the government would send an agent when we send the cards to the government and try to set up an election. This was a secret ballot election, that no one would know how they voted, not even the union, the company, nor any of the supervisors nor any of their fellow employees. That the individual, himself, and his own God would know how he voted at the election. There would be no problem that way whatsoever.

Patrick continued that after the election, if the Union won, the employees would nominate a negotiating committee and both the Company and the Union would have to bargain collectively in good faith. Patrick further stated that while he could not promise anything definite, the chances were that as a result of the bargaining the employees' benefits would be increased and that they would not lose any of their present benefits, although they might receive them in a different form.

After reading a membership application card to the employees, Patrick passed them out, together with postage-free return envelopes, and explained

that if they wanted to think about the matter further, or talk it over with their families, they could do so and mail the cards back to his office later. Patrick informed the employees about their rights under the Act and the work of the Board in protecting these rights, and asked the employees to be on the alert for violations of their rights.

During the course of the general meeting questions were asked from the floor. Among others, questions were asked concerning the benefits which would be sought through the Union. A considerable discussion of piecework rates ensued. In answering questions Patrick assumed that the Company was going to insist upon an election and consequently made frequent references to the election. These references to the election which Patrick anticipated would be held and his explanation that in the election, no one would know how he voted, neither the Union, the Company, nor their fellow employees would know, I find, were interpreted by some of the employees at the meeting as indicating that the cards would be used only for the purpose of obtaining an election."

that the cards would be used only to obtain an election. Rather I find, in accordance with the testimony of Patrick and Bonitt and several of the employees, that Patrick, after reading the text of the card, explained the procedure normally used in obtaining union recognition, stated that it would be followed in this case, but that very likely the Union would have to go to an election."

In light of the card's unequivocal language, the complete absence of any union misrepresentation, the noncoercive atmosphere and the employer's caution to the employees of the important consequences of their signing any union matter, I think the trial examiner was amply justified in his finding that the signing of the cards was entitled to greater weight than the post-election recall of "some" of the employees. As the D. C. Circuit has observed:

"[A]n employee's thoughts (or afterthoughts) as to why he signed a union card, and what he thought that card meant, cannot negative the overt action of having signed a card designating a union as bargaining agent."

Joy Silk Mills, Inc. v. NLRB, 87 U.S. App.D.C. 360, 185 F.2d 732, 743 (1950). When a large majority of employees has signed a completely lucid and straightforward authorization card, in the absence of any union misrepresentation or coercion, the legal effect may not be dispelled by later reconstruction of subjective impressions of the signers.

That the employees understood or may safely be presumed to have understood the significance of the cards is further evidenced by the events of January 19. On that occasion, Patrick read to the employees the letter he had sent to the company requesting recognition on the basis of the cards they had signed during the previous week. The trial examiner fairly concluded: "It seems unlikely to me that a union representative who only a week earlier had represented to the employees that the cards would be used only for an election would give publicity to an act, which if the Company's position is maintained, amounted to an outright breach of faith." Moreover, following his reading of the letter, Patrick reminded the employees that if they wished they could revoke their authorization. Not one withdrawal was made.

Because of the foregoing facts, largely uncontroverted, I would reject the company's contention that we must disregard en masse the authorization cards as proof of the union's majority. The Board's validation of the cards appears to be based upon more than sufficient evidence. And the excerpted passages of the examiner's report which the majority quotes, and to which I now turn, do not detract from this conclusion.

Patrick's assertion that "signers of cards would not be joining the union at this time" is quite consistent with his earlier explanation of authorization cards and does not support the inference suggested in the majority opinion. As explicitly stated thereon, the card was an *application* for membership. When Patrick was asked if this obligated the signer to pay dues, he truthfully answered that it did not, for, as the trial examiner found, under the standard union practice no one becomes a dues-paying member until a satisfactory contract has been negotiated with the employer. It was in response to this question about dues that Patrick's statement was made. His statement did not imply any use of the cards to secure an election; rather it stressed the limited purpose of designating the union as the bargaining agent of the employees.

As to the quote about confusion that the "cards would be used only for the purpose of an election," the trial examiner, in a portion of his findings the majority did not deem it important to cite, specifically disavowed any intention of implying that Patrick informed the employees that the primary purpose of the cards was to secure an election. "I find," he wrote, "that Patrick made no such representations."

In addition to claiming widespread vitiating confusion, the company attacked individual authorization cards as the products of union-sponsored misrepresentation. The trial examiner in his de-

cision, meticulously analyzed each card and the conflicting claims surrounding it. As a result, he invalidated several cards, but not enough to destroy the union's majority. Since his conclusions depend almost entirely upon an evaluation of credibility, this court is not in a position to dispute his findings. Daniel Construction Co. v. NLRB, 341 F.2d 805 (4th Cir. 1965).

When presented with cards signed by an overwhelming majority, the employer predicated his refusal to bargain solely on his asserted incredulity that the union could have secured so many signatures in so short a time. This hardly suffices as ground for a good faith doubt, and was properly dismissed by the trial examiner as a lame excuse in order to gain time in which to dissipate the union's majority. Since the employer had no *bona fide* doubt and substantial evidence supports the Board's finding of a validly-obtained majority, it is the court's duty to enforce the Board's bargaining order.

## II

The Board's finding of discriminatorily-motivated lay-offs is similarly grounded in substantial evidence. Although the employer claims economic circumstances as justification for its actions, the curious timing of the layoffs and the recalls merited a deeper investigation. Upon an extensive analysis of the employer's records, the trial examiner found that the economic claims were pretextuous and that anti-union animus actually motivated the layoffs. The finding cannot be brushed aside as without record support.

On February 19, the day immediately following the signing of the consent election agreement, the company laid off 8 employees, 7 of whom had signed authorization cards. Despite the fact that there was no apparent change in the next month and a half in the sales figures relied upon by the company to support the layoffs, the company recalled all but one of the eight within the week following the election, when, of course, the unionization crisis was over.

Two of the eight were members of the union's organizing committee, the names of which had been submitted to the company. One of these had the same male plant-wide seniority (the criterion used by the company) as an employee known to be anti-union in his sympathies who was not laid off. Two others laid off were victims of the interrogation that led to the 8(a) (1) violations found by the majority; consequently, the views of these two men were also presumably known to the company. In addition, the trial examiner found from other testimony that the company, through its supervisors, was aware of the union sympathies of the other men laid off. These facts, especially in light of the illegal campaign waged by the employer, strongly suggest an anti-union motivation for the layoffs violative of 8(a) (3). See NLRB v. Associated Naval Architects, 355 F.2d 788 (4th Cir. 1966).

Against this array of evidence, the company offers the drop in sales from the previous year, to justify its actions. The sales statistics support the company's contention, assuming a substantially similar number of employees during the comparable period in 1964. But the figures prove too much. The slack in sales began two months before the layoffs and, as noted before, continued for two months after the recall. Manifestly there was warrant for the examiner's view that the drop in sales had no causal relationship to the layoffs.

The trial examiner's view of the business situation, it may be conceded, is not inescapable. But in view of the anti-union campaign, the timing of the layoffs and recalls, the known sympathies of those laid off and the questionable nature of the asserted economic justification, the trial examiner's finding has substantial basis in the record considered as a whole, and the Board's reparation order is entitled to enforcement.

Although I concur in the court's enforcement of the Board's 8(a) (1) order, for the foregoing reasons I dissent from the court's refusal to enforce the remainder of the order.