**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CALIFORNIA COMPRESS COMPANY, Inc., Respondent.**

**No. 16422.**

United States Court of Appeals
Ninth Circuit.
Dec. 21, 1959.

Stuart Rothman, Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Norton J. Come, Frederick U. Reel, Donald J. Bardell, Attys., N.L.R.B., Washington, D. C., for petitioner.

Avery, Meux & Gallagher, Fresno, Cal., Doty, Evans & Quinlan, William Quinlan, Fresno, Cal., for appellee.

Gladstein, Andersen, Leonard & Sibbett, San Francisco, Cal., for International Longshoremen's and Warehousemen's Union.

Before POPE, HAMLIN and KOELSCH, Circuit Judges.

POPE, Circuit Judge.

This case is here on a petition of the Labor Board for enforcement of an order which found that Respondent California Compress Company, Inc. had violated § 8(a) (1) of the National Labor Relations Act,[1] and ordered that respondent cease and desist from certain named practices and take certain affirmative action, including posting of notices. The Board's order is reported at 121 N.L.R.B. 1388, reference to which will disclose both the Board's decision and the Examiner's report which summarized the evidence more fully than we deem necessary here.

Respondent was in the business of storing, handling and processing cotton at Fresno, California. The interstate character of its business is conceded. On November 6, 1957, the International Longshoremen's and Warehousemen's Union petitioned the Board requesting certification as collective bargaining representative of respondent's employees. By chance one of respondent's attorneys was in the regional office of the Board when the petition was filed and there learned of it. On inquiry he was told that the union had made a sufficient showing of interest. He communicated by telephone with respondent's president who expressed disbelief that he had any union members or that any application had been signed, "let alone a majority." The attorney again discussed with a Board employee the cards filed with the Board and was told that they seemed to be current and it appeared that 80 percent of the 86 employees had signed. On inquiry as to their authenticity he was told that the FBI could check the signatures on the cards by comparing them with signatures on cancelled pay checks.

Instead of pursuing the suggested method of verifying the signatures, respondent's officials undertook to handle the matter in their own way. They were seemingly still incredulous that the employees had signed up with the Union. The Plant Superintendent assured the president he was sure none had signed but that all he had to do to find out was to "ask the boys". It seems probable that what then happened was due in large part to the respondent's mistaken apprehension in both these respects.

Respondent's version of its then actions, detailed at length in the Examiner's report, is as follows: "Respondent had a good faith doubt that the Union

1. "Sec. 8(a) It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7; * * *"
"Sec. 7—Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3)." 29 U.S.C.A. §§ 158(a) (1), 157.

represented any of its employees and with uncoercive questioning determined that none of the employees wanted the Union. It thereupon prepared the affidavit for the purpose of submitting it to the Board to assist the Regional Offices of the National Labor Relations Board in making a determination of whether or not there was a sufficient showing of interest."

The affidavit referred to was one prepared by respondent and which it requested the employees to sign. It read as follows: "The undersigned, each for himself, after first being sworn, deposes and says: That he was on the 6th day of November, 1957, and is now, employed by California Compress Co., Inc., a corporation, at its cotton compressing plant at Nielsen Avenue and Marks Street, Fresno, California, and in such employment performs production and maintenance work; that he has not affixed his signature to any card or paper intending thereby, or being advised that such signature would be used, to support a claim of representation by International Longshoremen's & Warehousemen's Union, Independent, and that he has not knowingly signed any such document."

Of course an employer may, under proper circumstances, take a poll of its employees to ascertain their attitudes toward unionization. National Labor Relations Board v. Roberts Brothers, 9 Cir., 225 F.2d 58. In the case cited, the poll was a secret ballot. But here the affidavit not only had an anti-union sound about it, but it was circulated in a manner suggesting that the employee had better sign if he knew what was good for him; 82 employees did sign.

There was testimony that during this time when the affidavit was being circulated for signature by Respondent's Plant Superintendent one employee asked him "Well, if I don't sign this list will it cost me my job?" to which the Superintendent replied "Well, what I want to know is the men that signed this union card" and remarked "If I knew who they were, I would fire every one of them." According to the testi-mony the Superintendent said to a group of yard employees that if the union successfully organized them "the block men will come out in the yard and take the jobs, and they would have to go home." The same Superintendent was said to have told some 40 or 50 employees gathered in the boiler room during a rest period that he had information 50 men had signed with the union and "he said he would find out who they were." Another witness testified that on that same occasion the Superintendent had said "if the men wasn't satisfied, why, he could help them to another job."

Foremen circulated the affidavit at the direction of the Superintendent. To one employee, who was 64, one of these foremen said, "If I were you, at your age, I would take my name off and tell them I didn't know what I was signing." The same foreman, the testimony was, told another employee: "Well, the best thing for you to do is sign this because there's not going to be no election. You have been with us a long time and we would hate to see you go."

We think it significant that all these efforts to procure signatures to the affidavit took place prior to any effort to ascertain the genuineness of the signatures on the union cards in the manner that had been suggested. If the purpose was merely to check the authenticity of the union's claim of interest, one wonders why this more indirect way of getting at it was adopted. It suggests that the real purpose was to undermine the union.

We think, in view of the testimony given, there was substantial evidence to warrant the finding of the Examiner that the conduct of respondent and its supervisory representatives was coercive and an unlawful interference with the employees' right to self-organization. When the Board found that "the purpose of the interrogation and polling in such context was to undermine the Union, and not, as Respondent contends to gather evidence to assist the Board in determining the authenticity of the showing of interest made by the Union,"

its finding was fully supported by the record.

The decision and order of the Board will be enforced.