NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

MID-WEST TOWEL & LINEN SERV-
ICE, INC., Respondent.

No. 14482.

United States Court of Appeals
Seventh Circuit.

Nov. 4, 1964.

Rehearing Denied Dec. 29, 1964, en banc.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Joseph C. Thackery, Atty., N.L.R.B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Allison W. Brown, Jr., Atty., N.L.R.B., for petitioner.

Mozart G. Ratner, Washington, D. C., Leland B. Cross, Jr., Indianapolis, Ind., John B. Beasley, White, Haymond, Pierce, Beasley & Gilkison, Muncie, Ind., Ice, Miller, Donadio & Ryan, Indianapolis, Ind., for respondent.

Before HASTINGS, Chief Judge, and KNOCH and KILEY, Circuit Judges.

HASTINGS, Chief Judge.

We have this case on petition of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 151 et seq., for enforcement of its order issued against respondent Mid-West Towel & Linen Service, Inc. (company) on July 23, 1963. The Board's decision and order are reported in 143 N.L.R.B. 744 (1963). The Board's opinion fully states the facts and we deem it necessary to restate only such as are relevant to our decision.

The Board found the company violated Section 8(a) (1) of the Act by coercively interrogating employees concerning their union activities, soliciting employees to withdraw from or refuse to join Local 135, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (union) and sanctioning the taking of a poll to ascertain the union sympathies and desires of its employees.

The Board also found that the company violated Section 8(a) (3) and (1) by discharging Thomas E. Smith because of his activities in the union organizing campaign.

The Board further found that the company violated Section 8(a) (5) and (1) by refusing to recognize and bargain with the union and by increasing its minimum wage without notice to or consultation with the union at a time when the union represented a majority of its driver-salesmen employees in an appropriate unit.

The Board ordered the company to cease and desist from engaging in the above unfair labor practices and to reinstate Smith with backpay. The issues presented to us are whether there is substantial evidence in the record as a whole to justify the above findings by the Board.

The company employs eighty-nine persons "inside" its plant located at Muncie, Indiana. These employees have been represented for thirteen years by the Laundry Workers Union.

The company also employs about twenty-four "outside" employees as truck drivers or driver-salesmen who deliver and pick up uniforms, towels, etc. These employees have never been represented by a union although Teamsters Union Local 369, a predecessor of the union, twice unsuccessfully attempted to organize them. In both attempts elections were held and the union received no votes.

The company expanded rapidly after entering the industrial linen supply field in 1955 and its growth caused severe congestion in the area adjacent to its plant where delivery trucks are loaded and unloaded. Loading congestion was the subject of numerous complaints by the drivers, some of whom insisted that their duties should not include loading and unloading.

On Saturday, September 29, 1962, company vice-president Benjamin Hertz completed negotiations for a new Laundry Workers' contract covering the inside employees. The same day, driver Norman Childs picked up thirty union membership application cards from Pat Mahoney, a representative of the union. Childs and driver Edward Chesney signed cards and visited other drivers at their homes, securing thirteen additional signatures on Saturday and three on Sunday. Childs, Robert Nemyer and James Kierstead took the signed cards to Mahoney at his home. Driver Jack Janney signed on October 2 and driver

Jerry Johnson on October 4 to complete the campaign and bring the total number of signed membership cards to twenty.

## I

The company does not materially contest the Board's finding and order concerning violations of Section 8(a) (1) by coercively interrogating employees.

The company states, "we do not oppose an 8(a) (1) finding limited to interrogation designed to elicit information about individual participation [in the union], and an order narrowly drawn to require respondent to cease and desist from such interrogation."

■ We feel the record as a whole amply supports the Board's finding of coercive interrogation and that the Board's order respecting this finding is proper.

The company asserts that the Board's finding that Hertz sanctioned or conducted a private poll of the employees, which was, in essence, soliciting the employees to express sentiment against the union, is not supported by the evidence since Hertz was not present at the balloting and could not have known how any driver voted.

On October 8, 1962, the drivers held their regular sales meeting at a restaurant. Hertz entered and after excusing all other supervisors and three new drivers reported he had received the union's request for recognition and a letter from the Board he "hadn't read yet." He said he could not understand why the drivers needed a union to do their talking, he had always had an "open door policy," he was "deeply hurt" by the organizing attempt and it was "just like his son slapping him in the face."

Hertz asked the drivers what their problems were, stated he would do his best to "iron them out and keep us happy" and said the company was doing its best to alleviate the unloading situation.

Driver Chesney remarked that they had heard "the company's side" and the union should also be heard. Chesney stated the drivers would feel more secure under a union contract.

Philip Fosnaugh asserted he could not live on his earnings. Hertz promised that he would "see him after the meeting."

Hertz agreed to "talk about" additional insurance benefits. When an employee asked if benefits or bonuses would be taken away under a union, Hertz stated he was not "at liberty" to discuss such matters at that time.

Hertz said, "I have to know tonight where I stand," and the drivers had to make up their minds what they were "going to do about the union." He told the drivers if they wanted a union they could have it but he did not know whether the union had a majority and they should let him know "which way they wanted me to go—should I go down to negotiate a contract with Local 135 or should we fight them to an election." He reiterated that he had to know where he stood and that he wanted "to get this settled tonight and forget about it."

Driver Jack Janney suggested a vote. Hertz left the room. The employees voted by writing "yes" or "no" on the ballots.

After the voting Hertz returned and counted the ballots, assisted by driver Lewis Mathew. Hertz announced the results as fourteen to six against the union and declared, "I take it from this that you want me to fight the union to an election." He thanked the drivers for their "vote of confidence" in him.

Hertz was asked how the drivers could get their membership cards from the union. He replied that the "only way he knew was * * * to get a lawyer to write a letter" demanding their return.

It was suggested by one of the drivers that an employee committee be formed to take "all the gripes * * * straight to * * * [Hertz]." Four drivers volunteered to serve on such a committee.

■ Polling and interrogation of employees are not *per se* unfair labor practices. Frank Sullivan and Company, 133

N.L.R.B. 726, 727 (1961); Burke Golf Equipment Corporation, 127 N.L.R.B. 241, 245 (1960); Blue Flash Express Inc., 109 N.L.R.B. 591, 593 (1954). The Board has held that polling of employees does not violate Section 8(a) (1) of the Act if " 'it is clear from the record that the only purpose was to ascertain whether a union demanding recognition actually represented a majority' and where the interrogations ' * * * were communicated to the employees with assurances against reprisals * * * in a background free from hostilities to unions.' " Frank Sullivan and Company, supra at 727, quoting from Burke Golf Equipment Corporation, supra at 245.

The poll in the instant case was instigated by Hertz. Four days prior to the poll Hertz began interrogation of certain drivers, which the company admits, supra, was violative of Section 8 (a) (1) of the Act. Drivers Kierstead and Smith were discharged. Kierstead was rehired by Hertz the same day and the trial examiner found that Kierstead's discharge had been for cause and was not discriminatorily motivated. The trial examiner found that Smith's discharge was motivated by his union membership and activity. We agree. See infra. It thus appears the poll was not taken in a background free from hostilities and anti-union activities by the company.

The fact that Hertz absented himself from the room while the employees marked their ballots is immaterial. Hertz instigated the poll, was absent from the room only while the ballots were being marked and returned to count the ballots.

■ Neither do we find persuasive the argument that since the vote was by unsigned ballots and Hertz could not know how any driver voted the poll was not coercive. In view of prior coercive interrogation, the illegal discharge of Smith, the size of the group (twenty) and Hertz's sponsorship of the poll, his preceding remarks and presence, we do not think it unreasonable that the drivers would be coerced by the poll. There is substantial evidence to support the Board's finding that the poll violated Section 8(a) (1) of the Act.

II

The Board ordered the company to offer Thomas E. Smith immediate and full reinstatement to his former or a substantially equivalent position, with back pay.

The following events led up to Smith's discharge by Hertz.

At about 5:30 p. m., on October 4, 1962, Hertz called Smith and John Felton to his office. Hertz stated he had heard talk about a union and asked if they had heard it and why they needed one. Smith replied he had heard about the union. Hertz asked what their complaints were and they replied "the conditions in the plant." Hertz said he knew about "the conditions in the plant," he was doing all he could to remedy them and the union could not make him change those conditions. He assured them if they wanted a union they could get it and he would pay union wages but insisted he was presently paying higher than union wages.

Smith complained to Hertz about having to wait three hours on the highway for a replacement truck when his truck broke down. During the discussion of this complaint Hertz characterized Smith as a chronic complainer or "habitual bitcher." Smith stated, "I guess I'm just a born trouble maker and never will change."

Hertz asked Smith why he did not quit. Smith replied he liked route work. Hertz stated he wished Smith would quit.

Hertz excused Felton from the room and asked Smith why he was trying to hurt him. He asked if Smith was seeking a steward's job and whether Smith was "the ringleader" in unionizing the drivers. He invited Smith to go to work in a union place if he "wanted the union so bad" instead of trying to bring a union into the plant and hurt Hertz.

Hertz asked Smith if he had done anything for which he could be fired and added he could fire Smith or "all you boys involved in this and the union wouldn't make me keep you" because he could find a reason to discharge them. Hertz then told Smith to pick up his severance pay and not come in the next day for work.

Hertz testified that at a staff conference in June, 1962, he discussed Smith's alleged shortcomings and " * * * it was decided at that time that Tom Smith would have to go," as soon as the vacations ended. Vacations were staggered from June to September.

"The mere existence of valid grounds for a discharge is no defense to a charge that the discharge was unlawful, unless the discharge was predicated solely on those grounds, and not by a desire to discourage union activity." N. L. R. B. v. Symons Manufacturing Co., 7 Cir., 328 F.2d 835, 837 (1964).

It is clear Hertz was concerned about Smith's union activity. Smith had signed a union card and solicited other drivers to sign cards. Hertz asked Smith if Smith was the ringleader and whether Smith was seeking a steward's job.

■ We find substantial evidence on the record as a whole to support the Board's finding that "the predominating or motivating reasons for Smith's discharge were his union membership and activity, rather than that he chronically complained or because he 'bitched' continually, or because his production was unsatisfactory."

### III

The following facts led the Board to conclude that the company refused to bargain with the union in violation of Section 8(a) (5) and (1) of the Act.

Beginning on September 29, 1962, a few drivers signed union cards and began soliciting and obtaining the signatures of other drivers.

By October 4, 1962, twenty of a total of twenty-four drivers had signed union cards.

Drivers Lewis Mathew and John McCreery testified at the hearing conducted by the trial examiner that they signed the cards believing the signing was for the purpose of obtaining an election and not for obtaining union representation.

Jack Hoover testified initially he understood "that signing the card was to obtain an election." The trial examiner discredited his testimony due to subsequent contradictory statements. The examiner found Hoover testified credibly that he was in favor of the union.

On October 6, 1962, the company received by mail the union's request for recognition and petition for certification.

On October 8, Hertz appeared at the drivers' meeting and initiated the poll previously described.

The week following October 8, Hertz increased driver James Murphy's minimum guaranteed salary from $85 to $100 a week for a thirteen week trial period. About six weeks prior to this time, Murphy had been given a $5 a week raise and about four weeks prior a second $5 raise.

About this same time Hertz increased the minimum weekly guaranteed wages of two newly hired drivers from $85 to $100.

■ The company is guilty of violating Section 8(a) (5) of the Act if, as found by the Board, the union in fact occupied majority status when it sought recognition on October 6 and the company's refusal to recognize the union was motivated by a desire to gain time to dissipate the union's majority rather than a good faith doubt as to the union's majority status. Joy Silk Mills v. National Labor Relations Board, 87 U.S. App.D.C. 360, 185 F.2d 732, 741 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350.

The company contends the union never occupied majority status, relying on our decision in N. L. R. B. v. Koehler, 7 Cir., 328 F.2d 770 (1964).

In Koehler, twenty employees constituted a majority and union cards were

signed by twenty-two employees. In holding the union did not have a majority, we stated, "the overwhelming proof [is] that *many* employees signed cards because they were promised that such cards were to be used for the purpose of obtaining an election, with a secret ballot, to be conducted by the Board." (Emphasis added.) Id. at 773. In Koehler, the union barely had a majority number of cards while here the majority was substantial. In Koehler, "many" employees believed the cards were to obtain an election while in the present case only two employees were found to have this belief.

The company asserts it to be "virtually certain" that other employees than the two mentioned above believed the cards were for the purpose of obtaining an election. At the top of each card in large capital letters were the words, "APPLICATION FOR MEMBERSHIP AND AUTHORIZATION FOR REPRESENTATION." In light of this language and the absence of sufficient testimony to the contrary, we hold the trial examiner's finding, that a majority of employees signed for the purpose of representation, to be supported by substantial evidence. See National Labor Rel. Bd. v. Stow Manufacturing Co., 2 Cir., 217 F.2d 900, 902 (1954), cert. denied, 348 U.S. 964, 75 S.Ct. 524, 99 L.Ed. 751.

The company argues that assuming the union did have a majority, the company's refusal to bargain was based on a good faith doubt as to the union's majority status.

■ The company's Section 8(a) (1) violations occurring about the time of the union's request for recognition, while not permitting a mechanical finding of intent to dissipate a union's majority. Cameo Lingerie, Inc., 148 N.L.R.B. No. 60 (August 27, 1964), may properly be considered in determining the company's intent.

On October 4, 1962, Hertz coercively questioned Kierstead, Childs, Felton and Smith concerning the union and discharged Smith for union activity. The union sent Hertz a letter requesting recognition which he received on October 6. On that day Hertz asked Childs to "talk the boys out of the union." On October 8, Hertz initiated the poll, supra, and shortly thereafter raised the minimum weekly guaranteed wages of newly hired employees.

Hertz committed these acts contemporaneously with the union's organization campaign and request for recognition. Under these circumstances the unfair labor practices are indicative, although not dispositive, of the company's motive in not recognizing the union.

The company points to statements made by Hertz, upon which the Board relied in its finding of lack of good faith in refusing to bargain, and argues that these statements do not indicate lack of good faith. The trial examiner heard the testimony of the witnesses and judged their credibility. He was in a better position to determine the effect to be attributed to such statements than we are from the record.

In view of the unfair labor practices which accompanied the company's refusal to recognize the union and the trial examiner's appraisal of the testimony, we are convinced there is substantial evidence in the record as a whole to support the Board's finding that the company's refusal to bargain was not in good faith.

Finally, the company argues that the poll demonstrates the union lost its majority and this loss was not a result of unfair labor practices by the company.

■ From our holding, supra, that substantial evidence supports the Board's finding that the poll was itself an unfair labor practice and coercive, it follows that the results of this poll cannot be used to demonstrate the union lost its majority.

■ The minimum wage increase by the company was a refusal to bargain in violation of Section 8(a) (5) in view of our holding that the union had a majority on October 6 and the company's refusal to recognize the union was not

in good faith. E. g., National Labor Relations Board v. Katz, 369 U.S. 736, 744–745, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962).

The Board's order is in all respects affirmed and enforcement is granted.

Enforcement ordered.