**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**AMERICAN CASTING SERVICE, INC., Respondent.**

**No. 15339.**

United States Court of Appeals
Seventh Circuit.
July 6, 1966.

---

Marcel Mallet-Prevost, Asst. Gen. Counsel, George B. Driesen, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Walter Meyer, Atty., N. L. R. B., Washington, D. C., for petitioner.

Thomas S. Mackinlay, Chicago, Ill., for respondent.

Before DUFFY and SCHNACKENBERG, Circuit Judges, and GRANT, District Judge.

GRANT, District Judge.

This case comes before the Court on petition of the National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act, as amended (29 U.S.C. § 151 et seq.), for enforcement of its order issued against respondent on February 18, 1965. The Board's decision and order are reported at 151 N.L.R.B. No. 23.

The Board, affirming the Trial Examiner's decision, found that respondent violated Section 8(a) (1) of the Act by interrogating employees concerning their union activities and the identity of union leaders; by threatening employees with loss of work and plant closure if they should choose the Union as their bargaining representative; and by failure to disavow an antiunion petition which employees were led to believe was authorized by respondent. The Board also found that respondent violated Section 8(a) (1) and (3) of the Act by discharging or laying off certain employees at its two plant locations.

Respondent resists enforcement of the order on the basis that there is no substantial evidence, when the record is considered as a whole, in support of the Board's findings. We disagree and therefore grant the Board's petition.

The respondent Company is engaged in the manufacture and sale of castings and related products. The business was founded in 1930 by Jack Davis, who became its President upon incorporation in 1956. His wife, Irene Davis, is the Company Treasurer and active in corporate affairs. Many employees testified to the Davises' resistance to the formation of a union in respondent's plants.[1]

At the time of the alleged violations the respondent operated two plants, at Owensboro, Kentucky and Princeton, Indiana. The findings of the Board are directed at incidents which occurred at both plants. A review of those findings disclosed the following:

*Owensboro Plant*

Union activity began in both plants in October, 1963. The first efforts at Owensboro resulted in meetings held in the home of employee Thomas Mason on October 17 and 21, 1963. At that time Robert Barron, organizer for the Union (International Molders' and Allied Workers), encouraged the men to unionize, and passed out union authorization cards. Within two weeks Barron notified Davis by letter that a majority of the twenty Owensboro employees had signed the cards requesting that the Union represent them in collective bargaining negotiations. However, the Union lost the elections which were held on January 7, 1964.

---

1. Besides the testimony of employees at the Princeton plant which attribute to Davis strong antiunion feelings, Davis testified in his own behalf that "I would probably label all unions parasites"; that "we never accept correspondence from the Union"; that he would not have permitted Barrett, an office employee, to read him a letter from any union; and that he kept employee Isaiah Young on "in spite of the fact that I knew he was active in the Union." Davis' wife admitted that she told Barrett over the telephone to throw the union representation petition in the wastebasket.

■ In the two weeks following the first meeting respondent's supervisory employees[2] interrogated at least four of the nine employees who attended that meeting. Paul Young questioned employee Johnson the day after the meeting. Jack Murphy quizzed employees Stafford, Mays and Bryant. To Mays, Murphy said "he heard that the guys were trying to get up a union, and he didn't believe that the men were for the union", and then added that Davis would "give the guys a raise that deserve it." Murphy frequently questioned Bryant about the union, warning him that "it would be best if I [Bryant] knew anything to tell him, because I was going to be out of work." Bryant also testified that Murphy told him that Davis would close up the plant and go to Florida.

Additionally, Mason, at whose home the meetings were held, testified that sometime in November, 1963, in the course of a conversation with Davis, the latter observed that the "union is trying to get in here" and continued "Before I'll have the Union, I'll shut both plants down and go to Florida." While Davis denied ever having made this statement, the Trial Examiner resolved the issue of credibility in favor of Mason.

■ None of the employees who were interrogated ever admitted to any knowledge about the attempted union organization, although all had attended the Mason meetings and signed union cards. Except for Davis' denial, no testimony was introduced contradicting the alleged threats and interrogations.[3] All of these facts, when taken together against a background of opposition to the union, fully justifies the conclusion of the Board that respondent coerced its employees in the exercise of their rights in violation of Section 8(a) (1) of the Act. N.L.R.B. v. My Store, Inc., 345 F.2d 494 (7th Cir. 1965); N.L.R.B. v. Mid-West Towel & Linen Service, Inc., 339 F.2d 958 (7th Cir. 1964); N.L.R.B. v. M. J. McCarthy Motor Sales Co., 309 F.2d 732 (7th Cir. 1962).

■ Between November 8 and December 15, 1963, respondent discharged seven of the twenty employees at the Owensboro plant. The Board, adopting the Trial Examiner's decision, found that five of the seven were selected for discharge because of their union activity.[4] This is amply supported by the record. All five discriminatees had attended the union meeting in Mason's home on October 17. Four of them, Mason, Stafford, Bryant and Johnson, had been interrogated about the Union by respondent's supervisors. All five had signed union cards. Of the thirteen employees retained at the plant, only three had signed these cards. Three others, nonunion men, were junior in point of service to most of the discharged discriminatees. Only one of the five discriminatees were rehired before August, 1964, although in that same period respondent filled numerous job openings.

2. The Board, in adopting the trial examiner's findings, properly rejected respondent's contention that Young and Murphy were not supervisors at Owensboro. The undisputed testimony shows that both Young and Murphy hired and discharged employees and directed them in their work, that Young granted employees time off, ordered them to work overtime, transferred an employee to another job, docked another's pay, wore a uniform labeled "Foreman" and corrected time-cards. Young told employees that Murphy was a supervisor, and, in addition to hiring, discharging and directing employees, Murphy was paid for holidays not worked. See N.L.R.B. v. Elliott-Williams Co., 345 F.2d 460 (7th Cir. 1965).

3. Neither Young nor Murphy were called upon to testify in rebuttal.

4. The five were employees Mason, Stafford, Bryant, Jackson and Johnson. While the Board found that respondent was justified in cutting back its work force for economic reasons, it concluded that the selection of union adherents for discharge constituted the violation. It was for this reason that the Board could dismiss the complaints of the other two discharged employees, Mays and Gibson; though both had signed union cards, and though Gibson had attended the Mason meetings, each had been employed for such a short time that their layoff was economically justified.

Respondent, in an attempt to justify the selection, filed affidavits of its President, Davis, asserting as grounds for discharge bases other than union activity. There was no support to these statements given at the hearing. To the contrary, evidence adduced from the discriminatees themselves tended to refute the charges that Mason was "elderly" (he was in fact 59); that Jackson was not a good worker (Jackson testified that supervisor Young told him "I was doing my work good"); that Stafford broke a machine (this happened three weeks before the lay-off; Stafford testified that he could not have prevented it, and no one criticized him about it at the time); and finally that Johnson "was doing very poor work" (no one ever criticized his work; he received a ten cent raise while working at Owensboro). Respondent made no allegation supporting the layoff of Bryant.

■■ Taking the record as a whole, multiple reasons appear for supporting the Board's findings of discriminatory discharge. Given respondent's knowledge of and hostility to the attempted union organization, the disproportionate treatment of union and nonunion workers in firing and rehiring, while ignoring seniority, constitutes very persuasive evidence of discrimination. N.L.R.B. v. Shedd-Brown Mfg. Co., 213 F.2d 163 (7th Cir. 1954); N.L.R.B. v. Bachelder, 120 F.2d 574 (7th Cir. 1941), cert. denied 314 U.S. 647, 62 S.Ct. 90, 86 L.Ed. 519 (1941). The failure of respondent to adequately explain its reasons for the selection of certain employees for discharge may also be considered in determining the true motives for the action. N.L.R.B. v. Radcliffe, 211 F.2d 309 (7th Cir. 1954); N.L.R.B. v. Shedd-Brown Mfg. Co., supra. In sum, we find that there is substantial evidence to support the Board's finding that respondent violated Section 8(a) (1) and (3) of the Act by pursuing a discriminatory policy in discharging five employees from the Owensboro plant.

*Princeton Plant*

Robert Barron, the Union organizer, contacted three Princeton employees in October, 1963, to promote unionization of that plant. He gave them union authorization cards to distribute to the other employees. On October 31, 1963, having received back a number of signed cards, Barron addressed a letter to Davis claiming to have the support of a majority of the Princeton employees requesting that the Union represent them. The following day Barron filed a petition for an election with the National Labor Relations Board. He never received a reply from respondent regarding representation. The union lost the election held on January 7, 1964.

A number of incidents occurred at the Princeton plant subsequent to October 31, 1963 which constituted the basis for the Board's finding that respondent violated Section 8(a) (1) of the Act:

(1) On November 4, 1963, when Mr. and Mrs. Davis were in Florida, they learned through a long distance telephone conversation with Betty Barrett, the employee in charge of their Princeton office, of the receipt of the Board's notification that the Union had filed representation petitions. After that conversation Barrett asked Princeton employee Hildred Perry, the brother of both Princeton Supervisor Lewis Perry and Mrs. Davis, to circulate among the employees a petition opposing the Union and obtain signatures thereto. Perry did so during working hours, advising some of the employees that their signatures on the paper would safeguard their jobs and cause Davis not to shut down the plant. Supervisor Perry, who knew that the petition was circulating, did not interfere. Employee Perry returned the petition to Barrett with approximately thirty signatures (out of fifty employees) attached. Davis, whom the Board found did not direct that the petition be circulated,[5] nevertheless failed to disavow it after he returned.

5. Davis denied having given any orders to Barrett directing that the petition be

circulated. Barrett was not called as a witness. The Trial Examiner discredited

The Board refused to find that Betty Barrett was a supervisor. It was found, however, that she occupied a key position in the office and frequently relayed information to the foreman or to other employees concerning production requirements. Based on these findings, and under the particular circumstances, the Board concluded that the employees would have reasonable cause to believe that she and Hildred Perry, who acted at her direction, were agents of management. The record shows that at least two employees, Terry and Hardiman, knew that Barrett had been in touch with the Davises on the day that the petition was circulated. Further, as already indicated, Supervisor Perry was aware of the petition and failed to stop it, and Davis did not disavow it after he returned.

■■ There is little dispute that substantial evidence supports the findings of fact as to the circulation of the petition. Further, the Board was authorized to find that the circulation of an anti-union petition, in the context of threats and other coercive acts, is a violation of Section 8(a) (1). N.L.R.B. v. Austin Powder Co., 350 F.2d 973 (6th Cir. 1965); N.L.R.B. v. California Compress Co., 274 F.2d 104 (9th Cir. 1959). However, respondent argues that since it was not shown that Hildred Perry had actual authority, his actions could not be attributed to the employer. We do not agree. The Supreme Court, in International Association of Machinists v. N.L.R.B., 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50 (1940), faced a similar contention where the employer was found to have interfered with employee's rights by assisting in the formation of a union. The employer claimed that the acts of solicitation complained of were performed by men who were not supervisors. The Court replied:

"The employer, however, may be held to have assisted the formation of a union even though the acts of the so-called agents were not expressly authorized or might not be attributable to him on strict application of the rules of *respondeat superior*. We are dealing here * * * with a clear legislative policy to free the collective bargaining process from all taint of an employer's compulsion, domination, or influence. The existence of that interference must be determined by careful scrutiny of all the factors, often subtle, which restrain the employees' choice and for which the employer may fairly be said to be responsible. Thus, where the employees would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates." 311 U.S. at 80, 61 S.Ct. at 88.

We believe that the same principle applies to the case before us. The evidence supports the Board's conclusion that in the eyes of the other employees Hildred Perry was acting with Davis' authority. Davis' failure to disavow the petition upon his return gives added weight to the reasonableness of that belief, and was properly considered so by the Board. See N.L.R.B. v. Birmingham Publishing Co., 262 F.2d 2 (5th Cir. 1959). An employer who seeks to take advantage of such activity is equally guilty with he who directs it at the outset. H. J. Heinz Co. v. N.L.R.B., 311 U.S. 514, 520, 61 S.Ct. 320, 85 L.Ed. 309 (1940).

■ (2) Early in November Davis made a speech to the assembled employees which was largely devoted to the problems caused by producing defective work, but in the course of which he stated that, if the Union came in, he would shut the plant, move to Florida, and live off other income. While Davis denied making this

the testimony of employee Hardiman who claimed that Perry told him, when he brought around the petition, that Davis had called "to get the union squashed down."

statement, four employees testified to its substance. The Examiner chose to believe the employees, and we accept this ruling on credibility. This threat plainly violated Section 8(a) (1) of the Act. N.L.R.B. v. J. H. Rutter-Rex Mfg. Co., 229 F.2d 816 (5th Cir. 1956); N.L.R.B. v. Superior Tanning Co., 117 F.2d 881 (7th Cir. 1941).

█ (3) Shortly after the Davises returned from Florida, Mrs. Davis, an active officer of the respondent Company, asked employee Miskell what the latter's son-in-law, employee Angle, would do about the Union. Upon receiving Miskell's assurance that Angle was antiunion, Mrs. Davis said, according to Miskell, that if he had anything to do with the Union, she would fire him out the door. The Examiner chose to believe Miskell's testimony in this respect, noting that Mrs. Davis was not called upon to contradict it. Again, this threat is clearly violative of Section 8(a) (1).

(4) The Board found a number of other instances which, when considered in the context of Davis' hostile attitude, were properly found to be violative of the Act. For example, General Foreman Kinder stated to employee McGarrah in the summer of 1963 that Davis would close the plant if a union organized it. Kinder also inquired of employee Parson in January 1964 (at or near the time of the union election) who the union leaders were.

█ As to these and a number of other instances respondent strongly attacks the credibility findings of the Examiner. We cannot say, after reading the record, that he erred in this regard. We note that such findings are generally unimpeachable. Saginaw Furniture Shops v. N.L.R.B., 343 F.2d 515 (7th Cir. 1965).

Between November 8 and December 13, 1963 respondent laid off ten of its fifty Princeton employees. The Board found that the layoff, similar to that at Owensboro, was occasioned by economic factors. But the selection of known union adherents, coupled with Davis' avowed union hostility, caused the Board to find that four of those laid off were a direct result of their union activity.[6] Three of the four discriminatees were active unionists, as the respondent well knew. Employees Nelson and Young had actively solicited other employees to become members. President Davis admitted that he knew Young was a Union leader. Betty Barrett, the office secretary who was close to the Davises, had identified Nelson as such. Employee Carter, who had signed a union card, refused to sign the antiunion petition despite a threat that if he wanted to have a job, he had better sign. The fourth discriminatee, McGarrah, who was not in fact a union member, was thought to be. He had expressed prounion views to General Foreman Kinder; Barrett stated on two occasions that she thought he was a union leader.

Again, as at Owensboro, respondent disregarded seniority in laying off these four employees, and as to three of them, Young, Nelson and Carter, offered no explanation for their discharge. Testimony was presented tending to justify the lay off of McGarrah, but the faults of which he was accused occurred some time before the layoff. Also, Foreman Kinder had a conversation with McGarrah after he was released in which Kinder told him that he had expected to re-employ McGarrah before that date. The Board properly inferred from this that McGarrah's alleged faults making him an unsatisfactory employee were not the true cause of his layoff. Taking the evidence as a whole, we cannot say that the Board erred in concluding that McGarrah was discharged for suspected union activity, and find that substantial evidence supported the conclusion.

---

6. The discriminatees were Nelson, Young, Carter and McGarrah. The reasons which the Board advanced for failing to find that the remaining six were discriminated against are similar to those found for the Owensboro layoff; lack of seniority and cause for discharge. Also, three of those laid off had not signed union cards.

Having fully reviewed the record in this case, we are of the opinion that substantial evidence supported each of the Board's findings. Therefore, the Board's petition for enforcement will be granted in full. It is so ordered.