**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

and

**Local 1401, Retail Clerks International Association, Intervenor,**

v.

**C & P PLAZA DEPARTMENT STORE, DIVISION OF C & P SHOPPING CENTER, INC., Respondent.**

No. 16907.

United States Court of Appeals Seventh Circuit.

July 17, 1969.

Rehearing Denied Aug. 14, 1969.

Marcel Mallet-Prevost, Asst. General Counsel, Harold B. Shore, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Lawrence M. Joseph, Atty., N. L. R. B., for petitioner.

John H. Bowers, Robert C. Kelly, Madison, Wis., John C. Carlson, Madison, Wis., for Local 1401, Retail Clerks International Association, Intervenor.

Joseph A. Melli, James K. Pease, Jr., Madison, Wis., for respondent.

Before CUMMINGS and KERNER, Circuit Judges, and HOFFMAN, District Judge.[1]

KERNER, Circuit Judge.

Petitioners, National Labor Relations Board (Board) and Local 1401, Retail Clerks International Association (Union) seek enforcement of an order of the National Labor Relations Board. The Board found that respondent C & P Plaza Department Store (C & P Plaza) violated Section 8(a) (5) and (1) of the National Labor Relations Act by failing and refusing to bargain with the Union even though the Union represented a majority of the employees in an appropriate unit. The Board also found that C & P Plaza violated Section 8(a) (1) of the Act by conducting a poll to determine its employees' union sympathies and affiliations.

Between the years 1948 and 1960, C & P Plaza operated a combined food and department store. The Union won representation for the employees in 1948 with C & P Drive-In, a predecessor of C & P Plaza. In 1960, the department store operations were separated from the food store and established at a new location. The department store was

---

1. Judge Hoffman is sitting by designation from the United States District Court for the Northern District of Illinois.

named C & P Plaza Department Store. Following the separation, the Union was recognized as the collective bargaining representative at each store. The first department store contract was negotiated for the April–June, 1960, period. An industry-wide work stoppage intervened and the second contract of March, 1961, was retroactive, running from January 1, 1961, through December 31, 1962. A third contract dated May 17, 1963, was entered into for the period January 1, 1963, through December 31, 1964. The 1963–64 agreement contained a union security clause without check-off as in the 1961–62 contract and also provided for automatic annual renewal after December 31, 1964, unless either party served notice of a desire to modify the agreement 60 days prior to the expiration date.

Peter Voeller, the Union's Secretary-Treasurer, on October 26, 1964, informed C & P Plaza of the Union's desire to modify the 1963–64 agreement. As was their practice, no negotiation commenced until January 14, 1965, when a meeting took place between Voeller and General Manager Russell Weber and other company officials. Weber stated no contract was in existence since the contract expired December 31, 1964. Voeller and C & P Plaza President Carl Payne agreed to extend the contract to July 1, 1965, and negotiate a new contract at that time because of the probability of converting to a self-service store. Payne assured Voeller he had no intention of "throwing out" the Union. Twenty-two members of the Union attended a union meeting that evening and agreed to the extension of the contract for the six-month period and paid their union dues.

The Union records indicate that on January 1, 1965, thirty-nine of the forty-seven employees were union members. Six left the employment before July 1. Twenty-eight of the remaining thirty-three members paid union dues through the end of June. A new employee, beginning in March, paid his dues through September.

On April 27, 1965, Weber sent Voeller the following letter:

Dear Mr. Voeller:

By verbal agreement we extended the above contract to 1st of July 1965.

We write this letter to notify you of our desire to terminate that agreement on July 1, 1965.

Voeller, who was out of town on union business, did not respond to the letter until early July, at which time a meeting was arranged at Weber's office for July 8. The conference terminated with Weber stating that there was no contract, that there would be no negotiation for a new contract and that he believed that the Union did not represent a majority of the employees.

Voeller called a union meeting which was attended by twenty employees, and Authorization of Representation cards were completed by thirteen of those present. By personal solicitation, an additional seventeen employees signed authorization cards, totalling thirty of the forty-six employees. Weber refused to accept the cards as evidence of majority representation, though he accepted the suggestion that bargaining sessions be held.

On July 27, the day following the Voeller-Weber meeting, management posted a notice for an employee meeting to be held on July 30. Management was represented by President Payne, General Manager Weber, and managers Witcomb and Hannon; twenty-seven employees attended. Weber stated that C & P Plaza felt that the Union no longer represented the employees, making no comment concerning the thirty authorization cards, and after stating that no one had to vote, asked the employees present how many wished to have the Union represent them. Only two or three responded.

Union proposals were submitted to the company on July 26 followed by bargaining sessions held on July 30, August 10 and 20. At each session, Weber stated any agreement would be dependent upon the results of an election. On August 6,

the company filed an election petition with the Board, which was dismissed by the Regional Director.

An unfair labor practice charge was filed against C & P Plaza by the Union on August 13, 1965, and the Regional Director issued a complaint on November 11, 1965. The trial examiner held that the company refused to bargain under Section 8(a) (1) and (5) and that the polling violated Section 8(a) (1). The Board affirmed and now seeks enforcement of its order.

## REFUSING TO BARGAIN

Respondent, C & P Plaza, contends that it did not violate Section 8(a) (1) and (5) of the Act because its refusal to bargain was based upon a good faith doubt that the Union continued to have a majority status. Joy Silk Mills, Inc. v. N.L.R.B., 85 N.L.R.B. 1263 (1949), enforced 87 U.S.App.D.C. 360, 185 F.2d 732 (1950). The Board, however, found that C & P Plaza lacked good faith and we conclude that the Board's finding is supported by substantial evidence.

Under this Court's decision in N.L.R.B. v. John S. Swift Co., Inc., 302 F.2d 342 (7th Cir. 1962), the conclusion as to the lack of majority representation must "have a rational basis in fact." 302 F. 2d at 346. The evidence here does not support such a conclusion. While twelve employees may have told Weber or other management officials that they were unhappy with the Union, four of the twelve were new and were unfamiliar with the Union's activities. Of the remaining eight, at least one claimed that he never spoke to management officials as to his union sympathies. Further, any good faith doubts that still persisted should have been resolved in favor of the Union after the presentation of thirty authorization cards.

Evidence of bad faith was the company's attempt to terminate the contract after 16 years rather than negotiate a new one. It had been the practice of respondent and the Union not to commence negotiations until after the expiration of the existing contract. The Union

through Voeller had no reason to believe there would be any change in this practice when he served notice of modifying the 1963–64 agreement on October 26, 1964. At the January 14, 1965, meeting to negotiate a new contract, Voeller was informed by Weber that the contract had expired on December 31, 1964, and respondent had no obligation to negotiate. Weber complained that the Union had not organized the employees at competitive establishments. President Payne told Voeller that the company had suffered losses and he was considering a changeover to self-service that would take about six months to effect. It was agreed that the 1964 contract be extended for six months, and negotiation of the 1965 contract would take place after July 1, 1965. The Union relied on these oral promises that the contract would be honored and that a new one would be negotiated after the six-month period. However, on July 8, 1965, Weber told Voeller that the company had no intention of entering into a new contract.

Another incident evidencing bad faith was the failure of the company to attack the Union's representation of a majority of the employees until the contract had ended. The majority status was not questioned in 1964 or in the January meeting of 1965. Rather, the majority representation was first challenged in a conversation between Weber and Voeller at the July 8 meeting. Following this comment, Voeller sought and received the thirty authorization cards, representing a majority of the employees. A few of the thirty did testify they had regretted signing the cards. However, no one of them by any action with the Union sought to retract the authorization.

The personal attacks on Voeller were also evidence of bad faith. William A. Moreth, business representative of the Union, testified that during March or April, 1965, while Voeller was negotiating with Weber, President Payne entered the room and stated "what does the communist want now." After the Union filed a charge under Section 8(a)

(1) and (5) but before the Regional Director issued a complaint, Payne said that he would "fight them [Union] with every penny [he had] and every drop of blood in [his] body" and that "if Pete [Voeller] was out on the side walk, [he (Payne) would] kill him right now."

Too, the company refused to recognize the thirty signed authorization cards. The cards provided in clear and unambiguous language that the employee authorized the Union to represent him "for the purpose of collective bargaining, respecting rates of pay, wages, hours of employment or other conditions of employment, in accordance with applicable law." These were not dual purpose cards. Under the *Cumberland Shoe* doctrine, Cumberland Shoe Corp., 144 N.L.R.B. 1268 (1964), an unambiguous authorization card is valid unless the company proves that "the employee was told that the card was to be used *solely* for the purpose of obtaining an election." N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 1925, 23 L.Ed.2d 547 (1969).

In *Gissel*, the Court held that the employee was bound by what he signed as long as there was free choice. Under *Cumberland Shoe*, the company was not justified in completely disregarding the authorization cards signed by thirty employees. The trial examiner observed:

> [T]hese cards were filled out completed in the handwriting of the signers, all of whom were intelligent educated people; and it would be preposterous under the circumstances here to find that any fraud or misrepresentation was practiced upon them by the Union of which they were already dues-paying members, and by whom this particular unit had been represented for approximately 5 years since separation from the food store unit.

■ The acts of the company in terminating the contract, not questioning the majority status until after the contract expired, and the disparaging statements as to Voeller, coupled with the refusal to take cognizance of the authorization cards, are sufficient evidence that the company lacked good faith in doubting that the Union continued to represent the majority of employees.

## POLLING EMPLOYEES

At the meeting of July 30, 1965, called by respondent, management was represented by President Payne, Managers Weber, Witcomb and Hannon. Twenty-seven employees attended. The meeting was opened by Weber who reviewed the Union—C & P Plaza posture of the contract. Prior to questioning, the employees were informed that no one need vote if they did not wish. He then asked, "How many of you people want the Union to be your bargaining representative?" Two or three raised their hands. This was the only question presented requesting a showing of hands. No secret ballot was suggested.

■ Interrogation by an employer is not *per se* unlawful. As the Court in *Gissel* said: "If he [employer] does make an investigation, the Board's recent cases indicate that reasonable polling in this regard will not always be termed violative of § 8(a) (1) * * *." 395 U.S. at 609, 89 S.Ct. at 1938. Criteria for such interrogation were originally established by the Board in Blue Flash Express, Inc., 109 N.L.R.B. 591 (1954). Under *Blue Flash*, "the test is whether, under all the circumstances, the interrogation reasonably tends to restrain or interfere with the employees in the exercise of rights guaranteed by the Act." 109 N.L.R.B. at 593. Some of the factors considered by the Board are: (1) The employees must be informed of the purpose of the poll; (2) The purpose must be to determine whether the Union's assertion of majority representation is correct; (3) The employer must assure the employee that there will be no "economic reprisals"; (4) And there must be no evidence that the company "at any time made any threats or promises violative of the Act, resorted to any reprisals or exhibited any anti-union animus." 109 N.L.R.B. at 592.

■ We find the record as a whole substantially supports the Board's finding of coercive interrogation and that the Board's order respecting this finding is proper. None of the conditions established in *Blue Flash* were met at the employee meeting. Weber did not inform the employees attending that he had seen the thirty newly signed authorization cards which constituted a majority of those employed, thereby misleading those present. While the purpose of the vote was communicated to the employees, it was preceded by a statement that "They did not have to vote if they didn't want to." The positioning of this statement obviously requested a negative vote to the question. Though assurances against reprisals were made, the vote by raising of hands immediately identified those who were pro-union, and as a result, the public voting produced a chilling effect.[2] Too, the employer was engaged in an unfair labor practice through its pretence of negotiating a contract, having previously determined that the contract expired on July 1, 1965. Finally, the record contains a number of statements made by President Payne evidencing his animosity toward the Union.

Polling under these circumstances has frequently been found to be violative of Section 8(a) (1) of this Act. N.L.R.B. v. Mid-West Towel & Linen Service, Inc., 339 F.2d 958 (7th Cir. 1964); N.L.R.B. v. Western Reserve Telephone Co., 323 F.2d 564 (6th Cir. 1963); N.L.R.B. v. California Compress Co., 274 F.2d 104 (9th Cir. 1959).

The Board's order is in all respects affirmed and enforcement granted.

Enforcement ordered.

2. Two years after the poll in the present case, the Board in Struksnes Construction Co., Inc., 165 N.L.R.B. 102 (1967) reviewed Blue Flash and revised the criteria as directed by the Court of Appeals for the District of Columbia Circuit in International Union of Operating Engineers, Local 49, AFL–CIO v. National Labor Relations Board, 122 U.S.App.D.C. 314, 353 F.2d 852, 856 (1965):

"We think the Board should come to grips with this constantly recurring problem [i. e. polling] for the protection of the employees as to their [S]ection 7 rights and for that of an employer acting in good faith. It would seem that the Board could, in the exercise of its expertise develop appropriate policy considerations and outline at least minimal standards to govern the ascertainment of union status, or even in given permissible situations, the desire of the employees respecting a contract with the Union." The revised criteria in Struksnes, supra, are:

Absent unusual circumstances, the polling of employees by an employer will be violative of Section 8(a) (1) of the Act unless the following safeguards are observed: (1) the purpose of the poll is to determine the truth of a union's claim of majority, (2) the purpose is communicated to the employees, (3) assurances against reprisal are given, (4) the employees are polled by secret ballot and (5) the employer has not engaged in unfair labor practices or otherwise created a coercive atmosphere.

The procedures in Struksnes were approved by the Supreme Court in N. L. R. B. v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).