**GREAT LAKES CARBON CORPO-RATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 17676.**

United States Court of Appeals, Seventh Circuit.

March 17, 1970.

George B. Christensen, Chicago, Ill., Joseph B. Donovan, New York City, for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, John Luis Antonio de Passalacqua, Atty., N. L. R. B., Washington, D. C., for respondent.

Before SWYGERT, Chief Judge, DUFFY, Senior Circuit Judge, and CUMMINGS, Circuit Judge.

DUFFY, Senior Circuit Judge.

The Great Lakes Carbon Corporation (Company) operates a petroleum coke processing plant in Chicago, Illinois. We have before us a petition by the Company 'to review a decision and order of the National Labor Relations Board (Board).[1] The Board has filed a petition for enforcement of its order.

The labor contract in effect at the time of the events here in question is not described in the decision of the Board. We think it is important to note that the contract provides for a Union Shop, a check-off, a grievance procedure calling for presentation of grievances by the "Workmen's Committee," culminating, if necessary, in compulsory arbitration. The contract also contains two no-stoppage, no-strike clauses, the second of which reads: "18.01. Should differences arise between the Company and its employees as to the meaning and application of the provisions of this Agreement, or should any local trouble of any kind arise in the Plant, there shall be no suspension of work or interruption of production on account of such differences, but an earnest effort shall be made to settle such differences immediately."

The contract with the Union permitted the Company to sub-contract some work as long as it did not displace Company employees or take work away from the employees.

Donald Cmar had been employed by the Company since 1961. He was chosen as Chairman of the Workmen's Committee in 1966. He and another committeeman were given leaves of absence by the Company in July or August 1966 to attend a school which the Union was conducting for Union committeemen at the Michigan State University.

The first difficulty between Cmar and superintendent Glenn Stahl was in September 1966 when Cmar directed an employee to stop the performance of his work.[2] The Company gave Cmar written notice that "further action of this nature will result in disciplinary action."

The second incident to which the Company took exception occurred on March 22, 1967. Due to severe weather conditions the previous winter, piles of "contaminated" coke had accumulated. It was necessary that these piles be removed and dumped. Many of the employees already were working overtime. The Company notified the independent contractor who did the dumping work to remove this contaminated coke. This led to a work stoppage by some employees and a threatened walkout.

---

1. The order of the Board was issued on May 16, 1969 and is reported at 175 N.L. R.B. No. 166.

2. Cmar later claimed he did not tell the employee to "stop work" but "to push a button" which would have stopped the machinery where the employee worked.

Superintendent Stahl testified that Cmar said to him "Glenn, I'm going to give you 30 minutes to get that contractor out of here or I'm going to pull everybody out of this plant."

Stahl withdrew the contractor from the removal task and the walkout did not occur. No grievance was ever filed over this incident.

On March 29, 1967, the Company sent a letter to Cmar with a copy to the Union, pointing out that the grievance sections of the contract were clear and that any slowdown or stoppage of work would not be tolerated; that Cmar would have to abide by the agreed-upon procedure as a condition of his continued employment. Pertinent parts of the letter stated: "Let me make it very clear to you, Mr. Cmar, that if you once again cause any disruption or delay in the normal operation of the plant, you will be discharged. If you once again threaten us with a work stoppage or a 'walk out' of one or more of our employees, you will be discharged. In order for you to continue in our employ, you must conduct yourself in a manner satisfactory to us, and in the same manner as all of our other employees are required to conduct themselves. * * * You are not allowed to tell any employee to disobey orders given by management and you are not to disobey any orders given to you. * * * We have agreed to a procedure for the orderly adjustment of differences. You will abide by that procedure as a condition of your continued employment."

The critical incident occurred on April 28, 1967. Cmar insisted on leaving the plant early to take employee John Kazmierczak to the Union Hall in connection with a claimed rate grievance which had not been filed.

Cmar went to Lawrence Beadle, the foreman, and using extremely vulgar and provocative language, threatened to take Kazmierczak to the Union Hall. The foreman asked Cmar to finish the shift (about one and a half hours' work) but Cmar refused. Foreman Beadle then replied also using vulgar language.

Cmar then threatened to beat foreman Beadle and added he would do so off the premises or he would have him "taken care of" by a ten cent telephone call. Cmar then filed a grievance on behalf of Kazmierczak and left to go to the Union Hall.

When superintendent Stahl learned what had happened, he made an investigation and after consultation with supervisory personnel, decided to "separate" Cmar the following morning. He phoned Cmar to come and see him Monday morning, but Cmar replied "There is no need of me coming in; I know I'm fired. Instead of coming in to see you, I am going to the Labor Relations Board and I won't have any trouble getting back to work." He did go to the Labor Board and the Board has ordered that he be reinstated.

The trial examiner found that during an inspection by a representative of the Illinois Factory Inspection Bureau, superintendent Stahl was caught by employee Cmar attempting to mislead the inspector as to the identity of a defective truck. This was, indeed, a serious charge. But even the Board now admits this charge was entirely false. The Board could do little less as it clearly appears from the evidence that it was personnel manager Kuntz and not Stahl who had any contact with the Factory Inspector. The examiner's finding in this respect shows how unreliable his findings were, yet, the Board " * * * hereby adopts the findings, conclusions and recommendations of the Trial Examiner."

The trial examiner also found that employee Kazmierczak was forced by the Company to work in a dusty silo after he had presented his doctor's report which indicated he should not do this kind of work. Again, a serious charge depicting a heartless employer. The difficulty is that this finding is absolutely false and the Board now admits the "error" by the examiner. The evidence clearly shows that the Company relieved Kazmierczak just as soon as he presented the doctor's report that he was in

poor health. It is indeed difficult to understand the action of the Board "* * * and hereby adopts the findings, conclusions and recommendations of the Trial Examiner."

When the charges were made against the Company, there was no complaint as to the March 29, 1967 warning letter which had been sent to Cmar. The complaint was that the discharge of Cmar was illegal.

It was the trial examiner who conceived the idea that the Company's letter was an unfair labor practice. However, the Board approves this but makes no comment as to the propriety or impropriety of the March 29th letter.

This Court has stated "Of course anyone charged with violation of the law is entitled to know specifically what complaint he must meet and to have a hearing upon the issue presented * * *. There is a denial of procedural due process of law when the issues are not clearly defined and the employer is not fully advised of them." N. L. R. B. v. Bradley Washfountain Co., 192 F.2d 144, 149 (7 Cir., 1951). Also see Engineers & Fabricators, Inc. v. N. L. R. B., 376 F.2d 482, 485 (5 Cir., 1967).

■ Therefore we hold that the writing of the letter by superintendent Stahl to employee Cmar cannot be deemed in violation of Section 8(a) (1).

■ The Supreme Court has stated "We do not require that the examiner's findings be given more weight than in reason and in the light of judical experience they deserve." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 497, 71 S.Ct. 456, 469, 95 L.Ed. 456 (1951). The record shows this examiner was unreliable. In the light of reason and judicial experience we cannot agree here with his findings. Therefore, we hold that under the circumstances of this case, the firing of Cmar was not a violation of Section 8(a) (3).

The petition of the Labor Board for enforcement of its order is

Denied.

SWYGERT, Chief Judge.

I respectfully dissent.

The question before us is whether on the record as a whole there is substantial evidence to support the Board's determination that the company violated 8(a) (1) and 8(a) (3) of the Act by threatening to discharge and by discharging employee Donald Cmar. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The correctness of the Board's determination in this case depends in large measure upon the resolution of conflicting testimony by the trial examiner. Credibility determinations by the trial examiner, especially if affirmed by the Board, should be rejected only in exceptional circumstances. N. L. R. B. v. American Casting Service, Inc., 365 F.2d 168, 174 (7th Cir. 1966); Saginaw Furniture Shops, Inc. v. N. L. R. B., 343 F.2d 515, 516–517 (7th Cir. 1965). Therefore, after careful examination of the record, I have concluded that the Board's findings are supported by substantial evidence. Accordingly, I would enforce the Board's order in its entirety.

### The 8(a) (1) Violation

From 1945 to 1965 employees at the Chicago plant of Great Lakes Carbon Corporation were represented by an independent union. In 1965 the Oil, Chemical and Atomic Workers Union won an election by a vote of 106 to 5 and became the bargaining representative for the plant's employees. A few months thereafter Donald Cmar became chairman of the Workingmen's Committee. It was his responsibility to press employees' grievances before company representatives.

Section 7 of the Act guarantees the right of employees to assert grievances against their employer. N. L. R. B. v.

Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962). Threats of discharge made to union grievance officials and designed to discourage the vigorous presentation of grievances violate 8(a) (1) of the Act. N. L. R. B. v. Thor Power Tool Co., 351 F.2d 584 (7th Cir. 1965). The Board found that threats intended to coerce Cmar in the exercise of his duties as chairman of the Workingmen's Committee were made by the company in a letter written by plant superintendent Stahl to Cmar on March 29, 1967.

The letter contained the following statements:

\* \* \* \* \* \*

This is not the first time you have violated the Articles of Agreement by assuming an irrational and irresponsible position. Be assured, however, it is the last time that such conduct will be tolerated.

\* \* \* \* \* \*

In order for you to continue in our employ, you must conduct yourself in a manner satisfactory to us, and in the same manner as all of our other employees are required to conduct themselves. You are, in addition to all other requirements, to perform the duties to which you are assigned, and you are not to leave your job for the purpose of conducting union business or personal business with other employees without permission.

Mr. Cmar, we have gone the limit with you. From now on you will conform to the Company's rules and regulations and you will abide by the terms of the agreement or you will be discharged.

The company argues that these statements were not intended to coerce Cmar, but instead were warnings justified by Cmar's conduct on March 22, 1967 in connection with a dispute over the contracting out to an independent contractor of the removal of "contaminated" coke from the company's Chicago plant.

With reference to that incident the trial examiner found that the employees working in and around the bagging department became alarmed because they feared they would lose work to the independent contractor. These employees discussed walking off the job. Cmar advised against such such action and persuaded the workers to remain on the job until Stahl could contact his superiors. Shortly thereafter Stahl was ordered by company officials to take the independent contractors off the job. Thus the trial examiner found that Cmar's action on March 22 averted a wildcat strike. Since Stahl was undoubtedly aware of Cmar's role in the March 22 incident, the letter written by him seven days later was almost certainly designed to discourage Cmar from taking vigorous action on behalf of employees in the presentation of grievances.

The majority attempts to justify the threats contained in the March 29 letter by relying upon the following testimony of Superintendent Stahl: "Glenn, I'm going to give you 30 minutes to get that contractor out of here or I'm going to pull everybody out of this plant." As previously stated, the trial examiner rejected this version of the incident and accepted that given by Cmar. I have carefully studied the record and the transcript of the testimony before the trial examiner and find no reason to reject this credibility determination.

### The 8(a) (3) Violation

The Board also held that Cmar was discharged in violation of 8(a) (1) and 8(a) (3). The trial examiner found that the facts surrounding Cmar's discharge were substantially as follows. On April 27 an employee, Kazmierczak, sought Cmar's assistance in the presentation of a grievance growing out of a work assignment allegedly in violation of the collective bargaining agreement. Cmar, who had been working continuously for approximately fifteen hours, asked foreman Beadle for permission to

punch out and to take Kazmierczak to the union hall to prepare a written grievance. At first Beadle resisted this suggestion but after he was reminded that Cmar had worked nearly seven hours overtime, he acquiesced. During this conversation both Cmar and Beadle traded insults and profanity. Shortly thereafter Cmar told his side of the story to Stahl and left the plant. About an hour after the episode Stahl and his assistant superintendent interviewed Beadle concerning the incident. On April 28 Stahl called Cmar and told him not to report for work on the Sunday night shift. Upon further questioning Cmar learned that he had been discharged.

Assuming, arguendo, that the profanity uttered by Cmar constitutes a valid ground for discharge, nevertheless, " * * * [t]he mere existence of valid grounds for a discharge is no defense to a charge that the discharge was unlawful, unless the discharge was predicated solely on those grounds, and not by a desire to discourage union activity." N. L. R. B. v. Symons Mfg. Co., 328 F.2d 835, 837 (7th Cir. 1964). I believe the record before us supports the trial examiner's conclusion that antiunion animus motivated the discharge of Cmar.

On the basis of the testimony before him the trial examiner determined from the threat of discharge contained in the March 29 letter that the company was seeking an opportunity to discharge Cmar. That the events of April 27 served as a pretext upon which to base the discharge is supported by the unequal treatment given to foreman Beadle. My examination of the transcript indicates that Cmar and Beadle were equally to blame for the profanity and insults uttered on April 27. Nevertheless, the record fails to indicate that Beadle was disciplined in any way for his part in the episode.

I would enforce the Board's order in its entirety.